

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-4-2007

# NY Susquehanna v. Jackson

Precedential or Non-Precedential: Precedential

Docket No. 07-1675

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"NY Susquehanna v. Jackson" (2007). *2007 Decisions.* Paper 355.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/355

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 07-1675

_____

NEW YORK SUSQUEHANNA AND WESTERN
RAILWAY CORPORATION,

Plaintiff/Fourth Party Defendant

v.

LISA P. JACKSON, in her official capacity as
Commissioner of the New Jersey Department of
Environmental Protection;
NEW JERSEY MEADOWLANDS COMMISSION;
ROBERT R. CEBERIO, in his official capacity as Executive
Director of the New Jersey Meadowlands
Commission; JAMES ANZEVINO, in his official capacity as
a Commissioner of the Meadowlands Commission;
MICHAEL J. GONNELLI, in his official capacity as a
Commissioner of the New Jersey Meadowlands Commission;
LEONARD R. KAISER, in his official capacity as a
Commissioner of the New Jersey Meadowlands Commission;
MIA M. MACRI, in her capacity as a Commissioner of the
New Jersey Meadowlands Commission;
ELEANORE NISSLEY, in her official capacity as
a Commissioner of the New Jersey Meadowlands

Commission; CHARLES A. RICHMAN, in his official
capacity as a Commissioner of the New Jersey Meadowlands
Commission; ARLENE WALTHER, in her
official capacity as a Commissioner of the New Jersey
Meadowlands Commission,

Appellants
Defendants/Counterclaimants/
Third Party Plaintiffs

v.

CARDELLA TRUCKING CO., INC.; CROSSROADS
RECYCLING, INC.; HUDSON-NATIONAL, LLC; MHF
LOGISTICAL SOLUTIONS, INC.;
MILLENIUM RESOURCE RECOVERY, LTD.;
ONTRACK LOADING COMPANY, INC.;
PRECISE CONSTRUCTION CONTRACTING, INC.;
RAIL-TECH, LLC.; SCOTT EXCAVATING, LLC; SLANE
RAIL TRANSPORT, LLC; SUSQUEHANNA BULK
SYSTEMS; X-PRESS RAIL TRANSFER, LLC d/b/a 94th
Street Rail Transfer, LLC,

Third Party Defendants

v.

SLANE RAIL TRANSPORT, INC.,

Fourth Party Plaintiff

2

Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Action No. 05-cv-04010)
District Judge: Honorable Katharine S. Hayden

Argued July 10, 2007

Before: AMBRO and HARDIMAN, <u>Circuit Judges</u>,
SHAPIRO,[*] <u>District Judge</u>

(Opinion filed September 4, 2007)

Stuart Rabner
   Attorney General of New Jersey
Nancy Kaplen
   Assistant Attorney General
Kevin P. Auerbacher (Argued)
   Deputy Attorney General
Jung W. Kim
   Deputy Attorney General
R.J. Hughes Justice Complex
25 Market Street, P.O. Box 093
Trenton, NJ   08625-0093

_____

[*]Honorable Norma L. Shapiro, Senior District Judge for
the Eastern District of Pennsylvania, sitting by designation.

3

Counsel for Appellants

G. Paul Moates, Esquire (Argued)
Paul A. Hemmersbaugh, Esquire
Matthew J. Warren, Esquire
Sidley Austin LLP
1501 K. Street, N.W.
Washington, DC   20005

Counsel for Appellee
NY Susquehanna and Western Railway Corp.

John M. Scagnelli, Esquire (Argued)
Kathleen J. Devlin, Esquire
Scarinci & Hollenbeck, LLC
1100 Valley Brook Avenue, P.O. Box 790
Lyndhurst, NJ   07071-0790

Counsel for Appellee
Third-Party Defendant
MHF Logistical Solutions, Inc.

Carter H. Strickland, Jr., Esquire (Argued)
Rutgers Environmental Law Clinic
123 Washington Street
Newark, NJ   07102-3094

Counsel for Amicus Curiae Appellant
Raritan Baykeeper, Inc., Hackensack Riverkeeper, Inc.
and Pinelands Preservation Alliance

4

Harold L. Segall, Esquire
Beveridge & Diamond, P.C.
1350 I Street N.W., Suite 700
Washington, DC   209995-3311

Stephen M. Richmond, Esquire
Marc J. Goldstein, Esquire
Beveridge & Diamond, P.C.
45 William Street, Suite 120
Wellesley, MA 02481

      Counsel for Amicus Curiae Appellant
      National Solid Wastes Management Association

Susan Shinkman, Esquire
Richard P. Mather, Sr., Esquire
Susan M. Seighman, Esquire
Commonwealth of Pennsylvania,
Department of Environmental Protection
Rachel Carson State Office Building
P.O. Box 8464
Harrisburg, PA   17105-8464

      Counsel for Amici Curiae Appellant
      Commonwealth of Pennsylvania, Commonwealth of
      Massachusetts, State of New York, State of Maine, and
      State of Colorado

Christine D. Petruzzell, Esquire
Wilentz, Goldman & Spitzer
90 Woodbridge Center Drive

P.O. Box 10, Suit 900
Woodbridge, NJ 07095

Counsel for Appellees
OnTrack Loading Co., Cardella Trucking Co.

---

OPINION OF THE COURT

---

AMBRO, Circuit Judge

Shipping solid waste to Midwestern landfills has become big business—particularly in places like New Jersey where capacity at in-state landfills is scarce. Railroads are prime beneficiaries of the increased demand for the means of shipping waste across the country. Many railroads accommodate this demand by building facilities within their rights-of-way for the storage and loading of waste, which often is brought to the loading facility by truck. As one might imagine, transferring solid waste from truck to rail car is not the cleanest of businesses, and so the State of New Jersey has tried to regulate it. Railroading, however, is historically the subject of federal regulation, so any state regulation affecting it raises the question of preemption. Because we conclude that the District Court's factfinding does not support its conclusion that all of the State's environmental regulations at issue are preempted here, we remand for consideration of each regulation individually.

## I.    Facts and Procedural History

In business since the mid-19th century, the New York Susquehanna and Western Railway Corporation ("Susquehanna") operates 400 track-miles in New York, New Jersey, and Pennsylvania. This dispute centers on activities at five of its New Jersey solid waste transloading facilities.[1]

Four of the facilities at issue dealt primarily or exclusively in solid waste generated at construction and demolition sites ("C&D waste"). Susquehanna built these facilities itself and either leased or owned the land. At each facility, Susquehanna sold most of its shipping capacity to a primary customer. These primary customers, known as "shippers," acted as middlemen between the generators of waste and the railroad. For a fee, they took title to C&D waste from the operators of the sites that generated it and hauled it by truck to Susquehanna's C&D transloading facilities. They then paid

---

[1] "Transloading" is a term of art in the bulk transportation industry. It means "[t]ransferring bulk shipments from the vehicle/container of one mode to that of another at a terminal interchange point." U.S. Dep't of Transp., Fed. Highway Admin., Freight Prof'l Dev. Prog., Freight Glossary, available at http://ops.fhwa.dot.gov/freight/FPD/glossary/index.htm. In the context of this case, it refers to transferring solid waste from trucks (which carried it from its point of origin) to Susquehanna rail cars (for carriage to landfills).

Susquehanna to load the waste onto rail cars and ship it to out-of-state landfills (which they paid to take final title to the waste). Because the shippers' value added was their ability to move waste efficiently from C&D sites to landfills, they used guaranteed-capacity contracts with Susquehanna to ensure that they could do so. Rather than operating the transloading facilities itself, Susquehanna hired a loading company to unload the trucks bringing in the waste, oversee its storage, and load it onto rail cars.

The fifth facility dealt only in contaminated soil, which was stored in sealed containers and emptied directly into sealed rail cars. The loading agent at that facility was a Susquehanna subsidiary, and the shipper had an exclusive contract with Susquehanna. Because the facility catered to only one customer, that customer controlled access to the facility.

At least initially, the transloading facilities were a mess.[2] Nearby residents complained that their houses and yards were covered in dust and grime, the noise was excessive, and the wastewater and stormwater runoffs were dirty. Of equal (if not

---

[2] Susquehanna notes that the facilities are now much cleaner than they were when they opened. Given the question presented (to what extent the State may regulate the facilities under federal railroad law), we believe that Susquehanna's voluntary efforts to clean up the facilities, while perhaps laudable, are not relevant to our disposition of the case.

more) concern to state officials was that the facilities posed, in the officials' judgment, potentially deadly fire hazards. The pollution and its perceived danger caused a public outcry, and New Jersey officials responded by promulgating a series of health, safety, and environmental rules that have come to be known as the "2D regulations". *See* N.J.A.C. § 7:26-2D.1.

For transloading facilities that deal only in containerized solid waste, the 2D regulations require that:

- the rail carrier provide the State with a narrative from an officer of the rail carrier describing the facility operations and certifying that containers will not be opened and that employees, the public or the environment will not be exposed to solid waste except as allowed in accordance with state law;

- nonputrescible [not decaying] solid waste not remain at the rail facility for more than 10 days, putrescible [decaying] solid waste for not more than 72 hours, and non-hazardous liquid waste in sealed containers not more than 180 days;

- solid waste received, stored or transferred at the rail facility be contained in sealed

9

containers that do not leak any liquids or solid materials and are not opened for any purpose at the facility, except that a container holding liquid waste may be opened briefly for the purpose of sampling the liquid provided the container is immediately resealed;

- the operation not result in the migration of odors outside the confines of the rail carrier's property;

- all solid waste containers staged or stored at the facility be secured at all times in a manner that prevents unauthorized access to the containers and their contents;

- an adequate water supply and adequate fire-fighting equipment be maintained or be readily available to extinguish any and all types of fires;

- solid waste vehicles not be queued or staged on any public roadway;

- the queuing and staging of solid waste vehicles be conducted so as to prevent traffic backups and related traffic hazards

10

on access roads servicing the facility;

- facilities and all appurtenances, other than those owned or operated by rail carriers, including vehicles while on-site, be positioned and buffered in such a manner that sound levels generated by the operation not exceed limits established pursuant to noise control rules;

- only solid waste vehicles properly registered and displaying the appropriate registration number and solid waste decal be admitted at the facility;

- the State's designated representatives and inspectors be admitted to inspect any building, or any other portion of the rail facility, at any time;

- any release or discharge of any solid waste that would harm human health and the environment at the facility be immediately reported by the facility operator or its designee to the State;

- an on-site emergency coordinator be designated who will be available during all

11

hours of operation for the purpose of handling emergency situations, such as, but not limited to, spills, discharges or releases of solid wastes at the facility; and

•   the facility maintain daily records of waste and submit quarterly reports within 20 days of the end of each calendar quarter summarizing waste receipts.

*See generally* N.J.A.C. § 7:26-2D.1(c).[3]

For facilities that deal in waste that is not confined to sealed containers, the regulations provide that:

•   all facility processing, tipping,[4] sorting, loading, storage and compaction of materials (that is, solid waste and mixtures of solid waste and recyclable materials)

---

[3] Because much of the language in the regulations is technical and unnecessary for our purposes, we have paraphrased them rather than quoting them directly.

[4] "Tipping" refers to the process of unloading waste from a truck into a storage facility. The "tipping floor" is the place where the waste is placed after it is unloaded from a truck and before it is loaded onto a rail car. *Cf. LaFleur v. Whitman*, 300 F.3d 256, 259–60 (2d Cir. 2002).

occur within the confines of an enclosed building that complies with all requirements of the Uniform Construction Code;

- the facility have concrete or equivalent tipping floors or ramps to ensure proper containment and channeling of wastewater to sanitary sewer connections or holding tanks and be constructed to withstand heavy vehicle usage, in compliance with applicable rules regarding the discharge of wastewater and the use of holding tanks;

- the facility have a system that collects, stores, and properly disposes of wastewater generated during normal operations, including wash-out and cleaning of equipment, trucks, and floors, in compliance with the applicable rules regarding wastewater and stormwater management;

- the operator clean each area where waste has been deposited or stored within each 24-hour period;

- no waste be stored overnight without

13

effective treatment to prevent odors associated with putrefaction;

- the facility property surrounding the actual waste management area be maintained free of litter, debris, and accumulations of unprocessed waste, process residuals, and effluents, and methods (such as fencing) of effectively controlling windblown papers and other lightweight materials be implemented;

- methods of effectively controlling dust be implemented in order to prevent migration outside the enclosed building and off-site;

- the operation not result in the migration of odors outside the confines of the enclosed building;

- an adequate water supply and adequate fire-fighting equipment be maintained or be readily available to extinguish any and all types of fires;

- the operator effectively control insects, other arthropods and rodents at the facility by means of a program implemented by an

14

applicator of pesticides, certified in accordance with the New Jersey Pesticide Control Code;

- the facility operate certified scales for the reporting requirements for waste transported by trucks;

- facilities' on-site roadways and storage areas have concrete or asphalt paving in those areas subject to vehicle loading and unloading activities;

- the facility not queue or stage solid waste vehicles on any public roadway;

- the queuing and staging of solid waste vehicles be conducted so as to prevent traffic backups and related traffic hazards on access roads servicing the facility;

- the facility and all appurtenances be positioned and buffered in such a manner that sound levels generated by the operation shall not exceed limits established pursuant to applicable noise control rules;

- only solid waste vehicles properly registered and displaying the appropriate registration number and solid waste decal be admitted for loading or unloading of any solid waste at the facility;

- the facility designate a secure area under the facility's control, located at a safe distance from the tipping area, where solid waste may be unloaded from those solid waste vehicles that are either exempt from state registration requirements or which must be manually unloaded;

- the facility not accept or in any manner handle hazardous waste or regulated medical waste as defined by state law, except in compliance with all applicable requirements for such activities;

- nonputrescible solid waste not remain at the rail facility for more than 10 days, liquid solid waste not more than 180 days in sealed containers, and putrescible solid waste not more than 72 hours;

- effective security procedures be implemented to control entry to the rail

16

facility, and exit from it, at all times;

- the State's designated representatives and inspectors be admitted to inspect any building or other portion of a rail facility at any time;

- any release or discharge of any solid waste at the rail facility be immediately reported by the facility operator or its designee to the State;

- an on-site emergency coordinator be designated who will be available during all hours of operation for the purpose of handling emergency situations such as, but not limited to, spills, discharges, or releases of solid wastes at the facility;

- the rail carrier maintain daily records of wastes received, a waste origin/disposal form for each load of solid waste received, and submit to the State monthly summaries of wastes received no later than 20 days after the last day of each month.

*See generally* N.J.A.C. § 7:26-2D.1(d).

Susquehanna asserted from the outset that it did not need to comply with the 2D regulations because they were preempted by the Interstate Commerce Commission Termination Act, 49 U.S.C. § 10501(b). After negotiations between Susquehanna and the State failed, the State, alleging multiple violations of the regulations at each site that continued for 250 days, assessed a civil penalty against Susquehanna of $2.5 million—$2,000 per day per site. Specifically, the State alleged that one or more of the sites:

- did not store waste in a fully enclosed building complying with the Uniform Construction Code (all sites);

- did not properly channel wastewater from the tipping floor into sewer system connections (all sites);

- did not properly collect, store, and dispose of wastewater generated through normal facility operations (all sites);

- did not properly control dust migration (all sites);

- failed to operate certified scales for purposes of reporting waste transported by trucks (all sites);

18

- spilled hazardous waste onto tracks and adjoining areas rather than keeping it contained (one site);

- failed to clean waste storage areas every 24 hours (four sites);

- failed to keep property surrounding waste management areas free of litter and debris (four sites);

- did not properly control odor emissions (four sites);

- did not properly control insects and rodents (four sites);

- failed to pave roadways and areas where waste was loaded or unloaded (two sites);

- allowed particulates to be released into the atmosphere causing air pollution (one site);

- allowed nonputrescible waste to remain on-site for more than 10 days (one site), and

19

- failed adequately to control access to the facility (one site).

App. at Aa217–28.

In response to the civil penalty, Susquehanna sued the State in the federal District Court for the District of New Jersey, asking the Court to declare that all of the 2D regulations were preempted by federal law and to enjoin New Jersey from enforcing the penalty. After the parties took limited discovery, the District Court held a hearing in December 2005 to assess the then-current conditions of the facilities and the issue of federal preemption. Two days into the hearing, after Susquehanna had called all of its witnesses but the State had only begun examining its first, the Court discontinued the hearing to attend to other matters. Over the next eight months, the parties tried to settle the dispute. In August 2006, they gave up. The Court asked for a final round of briefing and proposed to rule on preemption without concluding the hearing. Neither party objected, and the Court held that the Termination Act preempted all of the 2D regulations. The State appeals.[5]

Because the District Court heard live testimony and resolved disputed factual issues on that basis, we treat this case

---

[5] The District Court had jurisdiction under 28 U.S.C. § 1331. We have appellate jurisdiction under 28 U.S.C. § 1291.

as though it comes to us after a bench trial.[6]  Thus we review the Court's factual findings for clear error and its conclusions of law *de novo*.  *Frederick L. v. Dep't of Pub. Welfare of Pa.*, 422 F.3d 151, 154 (3d Cir. 2005).

## II.    Whether Susquehanna's Activities Are Covered by the Termination Act's Preemption Clause

In relevant part, the Termination Act provides that "[t]he jurisdiction of the [Surface Transportation] Board over transportation by rail carrier . . . is exclusive. . . . [T]he remedies provided under this part with respect to the regulation of rail transportation are exclusive and preempt the remedies provided under Federal and State law."  49 U.S.C. § 10501(b) (internal paragraph divisions omitted).  The Act defines "transportation"

---

[6] In the usual case, to rule for one side on legitimately disputed, material factual issues without taking the adverse side's evidence would not be "according to Hoyle." (Moreover, the Federal Rules of Civil Procedure only allow judgment after partial findings against a party that has been fully heard on the relevant issue. *See* Fed. R. Civ. P. 52(c).) But because the State had notice of the Court's intention to rule without additional testimony and did not object or otherwise raise the issue until now, any defect is waived. *Brenner v. Local 514, United Bhd. of Carpenters & Joiners*, 927 F.2d 1283 (3d Cir.1991) ("It is well established that failure to raise an issue in the district court constitutes waiver of the argument.").

as

> (A) a locomotive, car, vehicle, vessel, warehouse, wharf, pier, dock, yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail, regardless of ownership or an agreement concerning use; and

> (B) services related to that movement, including receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, and interchange of passengers and property[.]

49 U.S.C. § 10102(9). It defines "rail carrier," in relevant part, as "a person providing common carrier railroad transportation for compensation." 49 U.S.C. § 10102(5).

The first question to which we turn is whether the activities at issue are "transportation by rail carrier," and thus subject to the Termination Act. We begin with whether Susquehanna engages in "transportation" activities, and follow up with whether it acts as a "rail carrier."

**A. Whether Susquehanna's Activities are "Transportation"**

22

It is undisputed that operations of the facilities include dropping off cargo, loading it onto Susquehanna trains, and shipping it. Thus the facilities engage in the receipt, storage, handling, and interchange of rail cargo, which the Termination Act explicitly defines as "transportation." *See* 49 U.S.C. § 10102(9)(B). These operations fit within the plain text of the Termination Act preemption clause.

The State, however, argues that the operations must be "integrally" or "closely" related to providing rail service to qualify as "transportation" under the Surface Transportation Board's prevailing interpretation of the Act.[7] But the State's position seems based on a misreading of the Board's caselaw. It is true that the Board wrote in *Borough of Riverdale*, 4 S.T.B. 380 (1999) (declaratory order), that "facilities not integrally related to the provision of interstate rail service are not subject to our jurisdiction or subject to federal preemption." *Id.* at 387. But consider the entire paragraph:

> Finally, it should be noted that manufacturing activities and facilities not integrally related to the provision of interstate rail service are not subject

---

[7] Though both sides rely on Board decisions, neither has argued that we owe it deference under *Chevron U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 843–44 (1984). Because we believe the Board's interpretation of the Act's preemption clause is correct in all respects pertinent to this case, we need not decide whether formal deference is required.

23

to our jurisdiction or subject to federal preemption. According to the Borough, [Susquehanna] has established a corn processing plant. If this facility is not integrally related to providing transportation services, but rather serves only a manufacturing or production purpose, then, like any non-railroad property, it would be subject to applicable state and local regulation. Our jurisdiction over railroad facilities, like that of the former [Interstate Commerce Commission], is limited to those facilities that are part of a railroad's ability to provide transportation services, and even then the Board does not necessarily have direct involvement in the construction and maintenance of these facilities. *See Growers Marketing Co. v. Pere Marquette Ry.*, 248 I.C.C. 215, 227 (1941). *We cannot determine from the current record whether this facility is actually a corn processing plant or some sort of transloading operation (for the transfer of corn syrup, for example) that is related to transportation services.*

*Id.* (emphasis added). In other words, the Board distinguished "manufacturing," which is not sufficiently related to transportation by rail, and "transloading," which is.

Accepting the factual findings of the District Court in our

24

case as true, it deals with "transloading." Hence, whatever the legal effect of the Board's adverb "integrally" (which we suspect is minimal or none), transloading qualifies as transportation.

In addition, the Court of Appeals for the Second Circuit has held that transloading activities fall within the Termination Act's definition of "transportation." *See Green Mountain R.R. Corp. v. Vt.* (*Green Mountain 2d Cir.*), 404 F.3d 638, 642 (2d Cir. 2005) ("Certainly, the plain language [of the Termination Act] grants the [Surface] Transportation Board wide authority over the transloading and storage facilities undertaken by Green Mountain."). Thus we hold that transloading operations are "transportation" under the Termination Act.

The State claims, however, that the District Court erred in not recognizing that Susquehanna engages in waste sorting and processing as well as transloading at its facilities. Sorting and processing, it argues, are not "transportation" because they do not have the requisite nexus to the movement of property by rail. Rather, those activities can be done anywhere and need not have anything to do with the loading or shipment of solid waste. *Amicus curiae* National Solid Wastes Management Association, a trade association of solid waste collectors and processors, agrees. It explains that separating recyclables from other C&D waste is part of its members' function as waste processors. Nat'l Solid Waste Mgmt. Ass'n Br. at 12–14. According to the Association, the food chain works as follows: people with waste

25

pay a shipper to take title to it. The shipper then delivers the waste to a processor who, for a fee, separates out valuable materials, such as scrap metal, wood, and appliances. The shipper sells the valuables to recycling plants. It also engages a railroad to take the remaining waste to a landfill, and it pays the landfill to take title to the waste. Shippers make money by getting more for the waste—from the initial owner and from recycling plants—than they pay for processing, transport, and ultimate disposal. Here, according to the Association, we have a railroad acting as transport company, transloader, *and* processor. By charging a low combined transloading/sorting fee (Susquehanna's expert refers to the transloading process as a "loss leader"), the railroad increases demand for its real service, which is hauling waste to landfills. But here's the rub: waste processing is a heavily regulated industry. According to the Association, the railroad gains a competitive advantage if it can shield its processing activities from regulation by characterizing them as "transportation by a rail carrier" and thus preempting burdensome state regulations. *Id.*

The District Court characterized the sorting activities at the facilities as the *de minimis* removal of items that did not comply with the shipper and landfill's disposal contract. It further found that because sorting and loading took place at the same time, they were actually one process, the dominant character of which was loading. App. at Aa38 (D. Ct. Op.). The Court likened it to a loader removing a Toyota Camry from a shipment it knew was supposed to be Ford Explorers. *Id.*

26

Determining how to review the Court's characterization is difficult because the line between fact and law here is blurry. On one hand, Susquehanna's expert plausibly characterized the removal of some items as an incidental and normal part of the loading process, *id.* (quoting App. at Aa1390–91 (Test. of William Rinnicke)), and the District Court, as factfinder, was entitled to credit that testimony. *See T.R. v. Kingwood Twp. Bd. of Educ.*, 205 F.3d 572, 577 (3d Cir. 2000). Moreover, the Association's characterization of this kind of sorting as "waste processing" with value independent of the transloading process, while perhaps persuasive, is not in the record. On the other hand, even accepting the facts underlying Susquehanna's characterization as true, we must apply those facts to the Termination Act's definition of "transportation" to decide whether they fit. *See Evans v. United Arab Shipping Co. S.A.G.*, 4 F.3d 207, 213 (3d Cir. 1993) (noting that "whether the facts meet [a] statutory standard is an issue of law" (citations omitted)).

Given all of the record evidence, we conclude that whether the District Court's characterization of the sorting process was correct is immaterial. The 2D regulations do not specifically regulate the sorting/processing aspect (to whatever extent there is one) of Susquehanna's facilities, nor does the civil penalty order have anything specifically to do with sorting or processing as opposed to storage and loading. Thus the question of whether a state could specifically regulate the sorting process (apart from the loading process) is not before us.

27

The regulations and penalty assessment here broadly regulate storage and transloading, irrespective whether the rail carrier also processes waste. Since both storage and transloading fall within the definition of "transportation," we need not consider whether the incidental processing activities do as well.

## B. Whether the Transloading Activities Are Undertaken "by a Rail Carrier"

The State argues that Susquehanna is not acting as a "rail carrier" when it ships waste from the transloading facilities for two reasons: (1) Susquehanna does not operate the transloading facilities itself, and (2) it grants virtually all of its hauling capacity at each facility to one shipper.

### 1. Susquehanna's Control over the Transloading Process

Our *Hi Tech* decision dealt with whether transloading activities were performed "by a rail carrier." *Hi Tech Trans, LLC v. N.J.*, 382 F.3d 295, 308–10 (3d Cir. 2004). In that case, we noted that Hi Tech, the transloader, operated the transloading facility under a license agreement with CPR, the rail carrier and owner of the land. *Id.* at 308. Hi Tech constructed and maintained the facility. *Id.* Moreover, the license agreement established that Hi Tech was not CPR's agent, and CPR disclaimed any liability from Hi Tech's operations. *Id.* CPR did not charge shippers a fee for using the Hi Tech transloading

28

facility (presumably, the shippers paid Hi Tech for the service). *Id.*

This case is different because (1) the rail carrier owned (or leased) the land and built the transloading facilities, (2) shippers pay the rail carrier to load their freight, and (3) the rail carrier does not disclaim liability for the loading process. The Board noted that the *Hi Tech* situation was "substantially different from a situation in which a rail carrier builds and owns a truck-to-rail transloading facility, and holds it out to the public as its own facility, but chooses to have a contract operator," which, presumably, would qualify as transportation by rail carrier. *Hi Tech Trans, LLC (Hi Tech STB)*, 2003 WL 21952136, at *5 n.13 (denying request for a declaratory order). Relying on this language, the District Court concluded that our case is just what the Board describes: a rail carrier (Susquehanna) building, owning, and advertising its own transloading facilities, which it uses a contract agent to operate.

While the District Court's conclusion that this case is distinguishable from *Hi Tech* is correct, a footnote from our *Hi Tech* decision complicates the issue. We wrote that "[w]e do not . . . suggest that a party can contractually determine its status as a railroad carrier for regulatory purposes." 382 F.3d at 308 n.19. This is a perplexing statement because the contract before us obviously plays some role in determining the "nature of [the loader's] . . . relationship to [the railroad]." *Id.* That is, after all, why it exists—to define the parties' relationship. Our point in

29

*Hi Tech*, though, was that railroads and loaders may not change by contract what in practice is a substantively different relationship.

Here, Susquehanna contracts with shippers to load their waste, which it then pays a loading agent to do on its behalf. In *Hi Tech*, the loader contracted with shippers directly. The State argues that this is a distinction without a material difference, as Susquehanna essentially just funneled money from shipper to loader (often the exact same amount). The difference, however, is that Susquehanna, by contracting directly with the shipper, assumed more liability than the *Hi Tech* rail carrier. Susquehanna could be sued for breach of contract (or potentially negligence or some other tort) if something went wrong; the *Hi Tech* railroad could not, as it was not a party to the shippers' and loaders' agreements. We regard this as a substantive difference between the *Hi Tech* case and this one, and therefore conclude that the District Court appropriately distinguished it.

## 2.    Susquehanna's Guaranteed-Capacity Contracts

The State also argues that Susquehanna does not qualify as a rail carrier when it hauls freight from the transloading facilities because it does not act as a common carrier (though the State concedes that Susquehanna does so in other contexts). This is relevant because only common carriers fit the Termination Act's definition of "rail carrier." 49 U.S.C.

30

§ 10102(5). The statute does not further define the term "common carrier," but the general definition is "[a] carrier that is required by law to transport passengers or freight, without refusal, if the approved fare or charge is paid." BLACK'S LAW DICTIONARY 205 (7th ed. 1999). The core of the State's argument is that, because Susquehanna sells in advance all (the contaminated-soil facility) or nearly all (the C&D facilities) of its capacity to one shipper, it offers nothing to the general public, as the definition of "common carrier" requires.

The common law differentiates between "private carriers" and "common carriers." *See, e.g.*, *York Co. v. Cent. R.R.*, 70 U.S. 107, 112 (1865) (holding that common carriers may limit their liability by undertaking private carriage). We have held that

> [t]he distinctive characteristic of a common carrier is that he undertakes to carry for all people indifferently, and hence is regarded in some respects as a public servant. The dominant and controlling factor in determining the status of one as a common carrier is his public profession as to the service offered or performed.

*Kelly v. Gen. Elec. Co.*, 110 F. Supp. 4, 6 (E.D. Pa.), *aff'd and adopted as circuit precedent*, 204 F.2d 692, 692 (3d Cir. 1953). A private carrier, on the other hand, offers services to limited customers under limited circumstances and assumes no

obligation to serve the public at large. *Lone Star Steel Co. v. McGee*, 380 F.2d 640, 645 (5th Cir. 1967) (citing *Ward Transp., Inc. v. Pub. Untils. Comm'n*, 376 P.2d 166, 169 (Colo. 1962)).

Susquehanna was certified by the Interstate Commerce Commission as a common carrier decades ago, and that certification is current. But, as then-Circuit Judge Warren Burger noted, "a common carrier may in some circumstances operate as a private carrier." *Overseas Nat'l Airways, Inc. v. Civil Aeronautics Bd.*, 307 F.2d 634, 636 (D.C. Cir. 1962); *see also York Co.*, 70 U.S. at 112. Even so, "a claim of such private carriage must show that the private activity is distinguishable from the public or common transportation business regularly carried on. The claimed private carriage must be viewed in relation to and against the background of the entire carrying activity." *Overseas Nat'l Airways*, 307 F.2d at 636.

Here, though the record on this issue is scant, a Susquehanna officer testified that it publishes its charges for hauling waste, App. at Aa1216, which indicates that it holds itself out to the public as available to transport waste. *Cf.* 49 U.S.C. § 11101(b) (requiring that common carriers provide their rates upon request). Moreover, as Susquehanna points out, there is nothing in the record (and no apparent allegation) that it has ever turned away a potential waste customer. Thus, if we follow the D.C. Circuit Court of Appeals's command to view Susquehanna's waste-hauling operation "against the background of the entire carrying activity," it appears merely part of its

32

overall common-carriage operation. *Overseas Nat'l Airways*, 307 F.2d at 636. Susquehanna holds itself out as willing to haul waste for a reasonable and publicly available rate; it does, in fact, haul waste for multiple customers; and there is no evidence of it turning away a customer. Moreover, Susquehanna's expert testified (credited by the District Court) that the waste-hauling industry lends itself to arrangements in which a middleman "shipper" consolidates demand so as to generate multiple car-loads that can be transported to a landfill as a group. This saves the cost of car-switching down the line. Allowing multiple shippers to load at a single transload facility would be difficult because their waste would have to be stored separately (as they presumably would not have contracts with the same landfills), requiring more space than many facilities can easily muster given the narrowness of railroad rights-of-way. Thus the norm is for railroads to build large customers their own dedicated facilities at different points on the same rail line (and to leave some capacity open for smaller shippers).

In the context of shipping bulk waste, we believe the concept of "common carrier" must be flexible enough to accommodate reasonable commercial practice. Indeed, in its decisions the Board merely defines the term "common carrier" as "a person or entity that holds itself out to the general public as engaged in the business of transporting persons or property from place to place for compensation." *Am. Orient Express Ry. Co.*, 2005 WL 3552968, at *3 (S.T.B. Dec. 27, 2005) (declaratory order). "In determining whether there has been a

33

holding out, 'one must look to the character of the service of the party in relation to the public.'" *Id.* (quoting *Penn. R.R. Co.*, 347 I.C.C. 536, 549 (I.C.C. 1974)). On this record it appears that Susquehanna holds itself out to the public as providing waste transport services in the manner common in the industry. This, we believe, is sufficient to affirm the District Court's determination that Susquehanna acts as a common carrier.

III.    **Whether the 2D Regulations Fall Within the Scope of Federal Preemption**

    A.    **The Scope of the Termination Act Preemption Clause**

Having established that Susquehanna's storage and transloading activities qualify as "transportation by a rail carrier" under the Termination Act, the next question is whether the Act preempts the State's attempt to regulate the environmental effects of these activities. The Termination Act states that "the remedies provided under this part with respect to the regulation of rail transportation are exclusive and preempt the remedies provided under Federal and State law." 49 U.S.C. § 10501(b) (internal paragraph divisions omitted). Keeping in mind that a federal law does not preempt state laws "where the activity regulated [by the state is] merely a peripheral concern" of the federal law, *San Diego Bldg. Trades Council, Millmen's Union, Local 2020 v. Garmon*, 239 U.S. 236, 243 (1959), we must look to the Termination Act's "remedies . . . with respect

34

to the regulation of rail transportation," 49 U.S.C. § 10501(b), to determine its core concerns. The Termination Act regulates, *inter alia*, rail carriers' rates, terms of service, accounting practices, ability to merge with one another, and authority to acquire and construct rail lines. *See generally* 49 U.S.C. §§ 10101–11908. Thus it regulates the economics and finances of the rail carriage industry—and provides a panoply of remedies when rail carriers break the rules. *See* 49 U.S.C. §§ 11701–11707.

Because the Act's subject matter is limited to deregulation of the railroad industry, *Fla. E. Coast Ry. Co. v. City of W. Palm Beach*, 266 F.3d 1324, 1337 (11th Cir. 2001), courts and the Board have rightly held that it does not preempt *all* state regulation affecting transportation by rail carrier. *See Green Mountain 2d Cir.*, 404 F.3d at 643; *J.P Rail, Inc. v. N.J. Pinelands Comm'n*, 404 F. Supp. 2d 636, 652 n.31 (D.N.J. 2005); *Vill. of Ridgefield Park v. N.Y., Susquehanna & W. Ry. Corp.*, 750 A.2d 57, 63 (N.J. 2000); *Riverdale*, 1999 WL 715272, at *5 ("[S]tate or local regulation is permissible where it does not interfere with interstate rail operations . . . ."). Contrary to New Jersey and the *amici*'s argument, the Termination Act does not preempt only explicit economic regulation. Rather, it preempts all "state laws that may reasonably be said to have the effect of managing or governing rail transportation, while permitting the continued application of laws having a more remote or incidental effect on rail transportation." *Fla. E. Coast. Ry. Co.*, 266 F.3d at 1331

35

(internal quotation marks, citations, and alterations omitted). What matters is the degree to which the challenged regulation burdens rail transportation, not whether it is styled as "economic" or "environmental."

Soon after Congress enacted the Termination Act, the newly created Surface Transportation Board ruled that, while broad, the Act's preemption clause "does not usurp the right of state and local entities to impose appropriate public health and safety regulation on interstate railroads," so long as those regulations do not interfere with or unreasonably burden railroading. *King County*, 1996 WL 545598, at *3–4. In *Cities of Auburn & Kent, WA*, 2 S.T.B. 330, 1997 WL 362017, at *6 (1997) (declaratory order), the Board expounded further:

> [T]here are areas with respect to railroad activity that are reasonably within the local authorities' jurisdiction under the Constitution. For example, even in cases where we approve a construction or abandonment project, a local law prohibiting the railroad from dumping excavated earth into local waterways would appear to be a reasonable exercise of local police power. Similarly, as noted by the Secretary [of Transportation], a state or local government could issue citations or seek damages if harmful substances were discharged during a railroad construction or upgrading project. A railroad that

violated a local ordinance involving the dumping of waste could be fined or penalized for dumping by the state or local entity. The railroad also could be required to bear the cost of disposing of the waste from the construction in a way that did not harm the health or well being of the local community. We know of no court or agency ruling that such a requirement would constitute an unreasonable burden on, or interfere with, interstate commerce. Therefore, such requirements are not preempted.

. . . .

[W]here the local permitting process could be used to frustrate or defeat an activity that is regulated at the Federal level, the state or local process is preempted.

For the Board, the touchstone is whether the state regulation imposes an unreasonable burden on railroading. *Id*. at *5.

In subsequent cases, the Board has explained that uniform building, plumbing, and electrical codes generally are not preempted because they do not unreasonably interfere with railroad operations. *Riverdale*, 1999 WL 715272, at *6. On the other hand, some local zoning ordinances, local land-use regulations, and environmental permitting requirements are

37

preempted because they unreasonably prevent, delay, or interfere with activities protected by the Act. *Id.* at \*5–6. The Board has emphasized, however, that even pedestrian regulations like building codes must be applied in a manner that does not discriminate against railroad operations to avoid preemption. *Green Mountain R.R.*, 2002 WL 1058001, at \*4 (S.T.B. 2002) (denial of request for a declaratory order).

Thus, according to the Board, state regulation is permissible if it passes a two-part test: (1) it is not unreasonably burdensome, and (2) it does not discriminate against railroads. *See Maumee & W. Ry. Corp.*, 2004 WL 395835, at \*2 (S.T.B. 2004) (denying request for declaratory order). This is a fact-intensive inquiry. For example, the Board has ruled that a state may take easements over rail lines when the facts show that doing so will not significantly interfere with the railroad's ability to conduct business. *See id.* On the other hand, the Board has held that even compelling state concerns like preventing terrorism will not save a local regulation that imposes too heavy a burden. *See CSX Transp., Inc.*, 2005 WL 584026, at \*8 (S.T.B. 2005) (declaratory order) (ruling that a D.C. law that prohibited transporting hazardous material within 2.2 miles of the U.S. Capitol without a permit was preempted).

The Court of Appeals for the Second Circuit has endorsed the Board's approach. In *Green Mountain 2d Cir.*, it stated that while pre-construction permitting programs often unreasonably interfere with rail travel, less burdensome and

38

non-discriminatory regulations would pass muster.  It explained further:

> It therefore appears that states and towns may exercise traditional police powers over the development of railroad property, at least to the extent that the regulations protect public health and safety, are settled and defined, can be obeyed with reasonable certainty, entail no extended or open-ended delays, and can be approved (or rejected) without the exercise of discretion on subjective questions.  Electrical, plumbing and fire codes, direct environmental regulations enacted for the protection of the public health and safety, and other generally applicable, non-discriminatory regulations and permit requirements would seem to withstand preemption.

404 F.3d at 643.

We believe that the approach of the Board and the Second Circuit Court is sound.  In particular, we agree that a state law that affects rail carriage survives preemption if it does not discriminate against rail carriage and does not unreasonably burden rail carriage.  The nondiscriminatory prong is particularly useful in determining whether a state is regulating principally to discriminate against a specific industry.  Much of

39

the Board's logic in finding that standard building, fire, and electrical codes are not preempted is that, while the costs of compliance may be high in some sense, they are "incidental" when they are subordinate outlays that all firms build into the cost of doing business. *See Riverdale*, 1999 WL 715272, at *6. Thus, for a state regulation to pass muster, it must address state concerns generally, without targeting the railroad industry.

As for the unreasonably burdensome prong, the most obvious component is that the substance of the regulation must not be so draconian that it prevents the railroad from carrying out its business in a sensible fashion. In addition, as the *Green Mountain* Court held, regulations must be settled and definite enough to avoid open-ended delays. *See* 404 F.3d at 643.[8] The animating idea is that, while states may set health, safety, and environmental ground rules, those rules must be clear enough that the rail carrier can follow them and that the state cannot easily use them as a pretext for interfering with or curtailing rail service. On this point, the Board's decision in *Cities of Auburn & Kent* is illustrative. *See* 1997 WL 362017, at *6. In that case, the Board found it relevant that the cities' real goal in creating an environmental permitting process was to constrain

---

[8] The *Green Mountain* Court held that only regulations that do not involve "the exercise of discretion on subjective questions" are permissible. 404 F.3d at 643. We believe this statement, taken alone, goes too far because, as we explain *infra*, some discretion is inherent in even the clearest regulatory schemes.

(rather than render safe) a railroad's operations. *Id.* It noted that one of the problems with the permitting process was that it gave the cities too much room to give effect to their anti-railroading policy in the guise of non-discriminatory environmental regulation. *Id.*

We do not hold that local regulations may not give state and local officials any discretion at all, for that would be impractical. Standard building, electrical, and fire codes no doubt give local officials some discretion. *See, e.g.*, Int'l Fire Code § 304.2 (2000) ("Storage of combustible rubbish shall not produce conditions that will create a nuisance or a hazard to the public health, safety, or welfare."); *id.* §§ 401.2 & 404 (giving local code official discretion to determine if fire safety plan is adequate). But such regulations may not (1) be so open-ended as to all but ensure delay and disagreement, or (2) actually be used unreasonably to delay or interfere with rail carriage. In other words, some regulations, like those at issue in the *Green Mountain* litigation, give too much discretion to survive a facial challenge because they invite delay.[9] In addition, even a regulation that is definite on its face may be challenged as-applied if unreasonably enforced or used as a pretext to carry out a policy of delay or interference.

---

[9] In *Green Mountain*, the permitting scheme at issue was so open-ended that it allowed the State to impose site-specific, burdensome regulations as conditions for permit approval. This process gave the State too much room to delay and burden rail travel. *See* 404 F.3d at 643.

## B.    Application to Susquehanna's Activities

Against this backdrop, the District Court found six problems with the 2D regulations.  First, it noted that potential fines of up to $50,000 per day per violation were excessive to the point of threatening Susquehanna with immediate shutdown. While this may be true, there appears to be little in the record demonstrating the (un)reasonableness of this amount (and the Court cites nothing).  Nothing prevents a state from imposing a significant fine on months of noncompliance with valid regulations, *Cities of Auburn & Kent*, 1997 WL 362017, at *6, and so one would expect some evidence to support the Court's factual finding.  Moreover, the fine in this case is only $2,000 per day; nothing in the record indicates that it is unreasonable.

Second, the Court stated that the provisions dictating the design, construction, and operation of the facilities made immediate compliance nearly impossible.  In effect, they operated much like a permit system.  This logic is sound: if a state imposes new regulations on existing rail facilities without giving reasonable time for them to come into compliance, then it would cause a delay (likely unwarranted) in the provision of rail service.  Again, however, the District Court did not connect its finding to anything in the record showing that the State's demands were unreasonable or were imposed without sufficient notice.

Third and fourth, the Court found that the regulations

42

gave the State too much discretion and invited open-ended delays. It noted that

> provisions authorize the State to penalize [Susquehanna] if the company does not maintain "*[e]ffective* security procedures . . . to control entry and exit at all times," and "*adequate* water supply and *adequate* fire-fighting equipment"; or if waste containers are not "secured at all times in a manner that prevents unauthorized access"; or if dust migrates outside the facilities; or if the staging of waste vehicles causes "traffic backups and *related traffic hazards*" on public roadways. N.J.A.C. 7:26-2D.1(c)(2)(iv), (c)(2)(v), (c)(2)(vii), (d)(7), (d)(9), (d)(22) (emphases added).

App. at Aa 46. We agree that many of the 2D regulations appear to grant significant discretion. The State protests that many of the regulations are written to give the rail carrier flexibility in determining how to comply, rather that set strict standards. The problem comes when the goal to be achieved is so subjective that the compliance process is open to unreasonable delay. In making this determination, it is important for a court to hone in on how wide the range of

43

discretion really is.[10]  We leave to the District Court on remand the task of determining whether a particular regulation is too subjective.

Fifth, the Court took issue with the State's power to enter and inspect rail facilities at any time to ensure compliance. Perhaps this power is open to abuse (and thus might give rise to an as-applied challenge).  *See Riverdale*, 1999 WL 715272, at *5.  But, given the State's interest in effectively enforcing its regulatory scheme, such a rule  is not *per se* unreasonable, and the District Court did not find facts to suggest that it is in the context of this case.

Sixth, the Court noted that the 2D regulations are discriminatory because by their terms they apply only to rail carriers.  The State counters that they are similar in kind to regulations that apply to other solid waste facilities.  *See, e.g.*, N.J.A.C. § 7:26-2.11 (general operational requirements for solid waste facilities); N.J.A.C. § 7:26-2B.5 (additional design requirements for transfer stations and materials recovery facilities); N.J.A.C. § 7:26-2B.9 (additional operational requirements for transfer stations and materials recovery facilities).  At first glance, the regulations do appear to be similar, but it is difficult to assess how similar they are without

---

[10]  For example, it is possible that a standard like "adequate fire protection" has a common enough meaning in the relevant industry that the range of discretion is actually narrow and compliance is straightforward.

44

knowing more about the industry. It appears, however, that the 2D regulations are, if anything, more relaxed than those that apply to other solid waste facilities—probably because the State was trying to steer clear of a preemption problem. Indeed, permitting requirements abound for other solid waste facilities. *See, e.g.*, N.J.A.C. § 7:26-3.6 (specifying permitting requirements for non-rail solid waste transfer facilities). As those are not allowed in this context, it would be impossible for the State to regulate rail facilities in the same way. Thus, evaluating the nondiscriminatory prong requires comparing the substance of the solid waste regulations that apply to railroads with those that apply to similar industries that deal in solid waste to determine if the State is discriminating against rail carriage. As the record before us does not show that was done, we cannot determine whether the 2D regulations are impermissibly discriminatory at this point.

The core concern for us is that the District Court did not make its findings regulation-by-regulation; rather, it found that all were preempted. This determination is, we believe, too broad. At least some of the regulations seem sufficiently certain and identical to those applied to non-rail facilities. For example, one of the regulations requires that all storage activities occur "within the confines of an enclosed building that complies with all the requirements of the Uniform Construction Code." N.J.A.C. § 7:26-2D.1(d)(1). Under *Riverdale* and *Green Mountain 2d Cir.*, this seems reasonable, certain, and

45

nondiscriminatory.[11]  We, however, are not in a good position to analyze each individual regulation because neither the briefing, the District Court's decision, nor the appellate record is sufficiently detailed.  Thus we remand for the District Court to make a determination of preemption for each regulation in the first instance.  It may turn out that most of the regulations are preempted, but it would be premature to invalidate those (like the construction-code requirement) that might survive on a more developed record.

At oral argument, Susquehanna objected to this sort of remand by arguing that the State did not ask the District Court to examine the regulations individually.  That is irrelevant. Susquehanna approached the District Court as a declaratory-judgment plaintiff asking the Court to strike down all of the 2D regulations.  New Jersey answered, asking the Court to uphold all of them.  The Court sided with Susquehanna.  Nothing prevents us, in our *de novo* review of the District Court's application of law to facts, *see VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 632 (3d Cir. 2007), from recognizing that the law in this area admits of more nuance than any of the parties (or the *amici*) argued and fashioning our remand accordingly.  Nor does

---

[11] We do not hold that this regulation is permissible, as we leave that question for the District Court to resolve on remand.  We merely point it out as an example of a regulation that *appears* permissible on its face.  On remand, the District Court is free to conclude otherwise with the benefit of a full factual record.

46

anything prevent us from concluding that the District Court's factfinding does not appear to support the breadth of the injunction it entered, and thus remanding for a more detailed inquiry.

\* \* \* \* \*

We hold that the Termination Act does not preempt state regulation if it is nondiscriminatory and not unreasonably burdensome. Because it appears from this record that some, but not all, of the 2D regulations may meet this test, we vacate the District Court's order permanently enjoining the State from enforcing the regulations, and remand for consideration of whether each regulation is preempted.[12]

---

[12] As to the civil penalty, if it is based in part or in whole on preempted regulations, the District Court should enjoin its enforcement. If this happens, New Jersey may, subject to relevant state laws and regulations, assess a new penalty based only on the regulations that survive.

47