# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| ROSS FONTANA | : | |
| | : | |
| Plaintiff, | : | C.A. No. K24C-04-018 JJC |
| | : | (Consolidated) |
| v. | : | |
| | : | |
| CSX TRANSPORTATION, INC., and | : | |
| ANITA ORONZIO AND GABRIEL | : | |
| ORONZIO, III, AS PERSONAL | : | |
| REPRESENTATIVES OF THE | : | |
| ESTATE OF LUIGI ORONZIO, | : | |
| | : | |
| Defendants, | : | |
| | : | |
| and | : | |
| | : | |
| ANITA ORONZIO AND GABRIEL | : | |
| ORONZIO, III, AS PERSONAL | : | |
| REPRESENTATIVES OF THE | : | |
| ESTATE OF LUIGI ORONZIO, | : | |
| | : | |
| Defendants/Cross-Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| CSX TRANSPORTATION, INC., | : | |
| | : | |
| Cross-Defendant. | : | |

Submitted: November 4, 2024
Decided: January 28, 2025

## OPINION

Roger D. Landon, Esquire, Philip Thomas Edwards, Esquire, Scott M. Himelein, Esquire, MURPHY & LANDON, Wilmington, Delaware, *Counsel for Plaintiff Ross Fontana.*

Chase Brockstedt, Esquire, BAIRD MANDALAS BROCKSTEDT & FEDERICO, LLC, Lewes, Delaware; Alexandria MacMaster, Esquire, Paul Bucci, II, Esquire, LAFFEY BUCCI D'ANDREA REICH & RYAN, Philadelphia, Pennsylvania, *Counsel for Defendants/Cross-Plaintiffs Anita Oronzio, Gabriel Oronzio, III, and The Estate of Luigi Oronzio.*

Stephen Dryden, Esquire, Walter O'Brien, Esquire, WEBER GALLAGHER SIMPSON STAPLETON FIRES AND NEWBY LLP, New Castle, Delaware, *Counsel for Defendants, Anita Oronzio, Gabriel Oronzio, III, and The Estate of Luigi Oronzio.*

Mackenzie M. Wrobel, Esquire, Brandon Harper, Esquire, DUANE MORRIS LLP, Wilmington, Delaware, Sharon L. Caffrey, Esquire, Jeffrey S. Pollack, Esquire, DUANE MORRIS LLP, Philadelphia, Pennsylvania, *Counsel for Defendant CSX Transportation, Inc.*

**CLARK, R.J.**

2

Plaintiffs Ross Fontana and the Estate of Luigi Oronzio (the "Estate") sue CSX Transportation, Inc. ("CSX") for personal injury and damages in survivorship arising from an accident at the New London railroad crossing (the "New London Crossing") in Newark, Delaware.[1]  CSX seeks dismissal of this now-consolidated action on multiple grounds.

First, CSX raises an issue of first impression in Delaware—whether Plaintiffs' claims are federally preempted.  There is a split of authority nationally regarding whether the federal Interstate Commerce Commission Termination Act ("ICCTA")[2] preempts state common law tort claims that involve allegedly dangerous railroad crossings.  CSX also moves to dismiss Plaintiffs' claims that CSX negligently failed to place a barrier across the New London Crossing.  For that part of its motion, it relies on the well-recognized *absence* of a duty owed by railroads to fence their lines. Furthermore, CSX contends that Plaintiffs' punitive damage claims must be dismissed because they fail to allege sufficient facts to support them. CSX further moves to dismiss Plaintiffs' negligence *per se* claims because the Plaintiffs identify no specific regulations or statutes to sustain them.  Finally, CSX moves to strike references in the complaint to prior accidents at the New London Crossing, along with allegedly superfluous language.

For the reasons below, ICCTA does not preempt Plaintiffs' common law tort claims at this stage of the proceedings.  Specifically, ICCTA does not expressly preempt their claims.  Nor does it impliedly preempt their claims based upon congressional intent that ICCTA pervasively occupies the field of railway regulation. Furthermore, CSX does not demonstrate, at the motion to dismiss stage, that ICCTA

---

[1] Plaintiffs also sued an affiliated entity of CSX Transportation, Inc., CSX Corporation.  The latter entity moved to dismiss Plaintiffs' claims against it based upon lack of personal jurisdiction. Neither Mr. Fontana, nor the Estate (in its capacity as a plaintiff and a co-defendant) opposed the motion.  Accordingly, the Court granted the motion at the oral argument.  *See* Order (D.I. 39).
[2] 49 U.S.C. §§ 10101–11908.

impliedly preempts Plaintiffs' claims on an as-applied basis. The answer to that final question must await a fully developed evidentiary record.

Apart from the issue of preemption, CSX's reliance on the common law exception that absolves railroads from fencing their lines is misplaced. Namely, that exception does not abrogate CSX's general duty as a possessor of land to take reasonable efforts to protect those who could foreseeably suffer harm at the New London Crossing. In addition, Plaintiffs' punitive damage claims meet notice pleading standards. Plaintiffs' allegations that *unspecified* regulations or statutes support their negligence *per se* claims, however, do not. Finally, there is no basis to strike references to prior accidents or superfluous language from the complaint. For these reasons and those discussed below, CSX's motion to dismiss is granted, in part, and denied, in part. Its motion to strike is denied in its entirety.

## I. FACTUAL AND PROCEDURAL BACKGROUND

As alleged in the complaints in this consolidated action, Mr. Fontana and Mr. Oronzio socialized with friends at an apartment one night in April 2022 in the north campus area of the University of Delaware.[3] Mr. Oronzio consumed alcohol at the gathering.[4] Later that night, Mr. Oronzio and Mr. Fontana decided to attend a separate gathering.[5] Mr. Oronzio drove the wrong way on New London Road, however, while heading toward West Main Street in Newark.[6] He then attempted to course correct.[7] While doing so, he inadvertently stranded his car at the railroad

---

[3] Compl. at ¶ 11 (D.I. 1). At the motion to dismiss stage, the Court accepts all allegations in the complaint as true. The parties, and the Plaintiffs in particular, included a significant amount of extrinsic evidence with their briefing. The Court has not considered that extraneous material when deciding these motions.

[4] *Id*. at ¶ 12.

[5] *Id*.

[6] *Id*. at ¶ 13. New London Road is a one-way road. Mr. Fontana alleges that Mr. Oronzio was under the influence of alcohol at the time he operated his vehicle. *Id*. at ¶ 35(d).

[7] *Id*. at ¶ 13.

crossing between New London Road and West Main Street (again, the "New London Crossing").[8]

An eastbound CSX train with attached locomotives approached the New London Crossing moments later.[9] Mr. Oronzio attempted to help Mr. Fontana exit the stranded vehicle when he saw the oncoming train.[10] But, the train struck his vehicle before he could.[11] Either the train, or the vehicle as the train collided with it, then struck Mr. Oronzio.[12] He passed away five days later as a result of his injuries.[13] Mr. Fontana also suffered severe injuries as a result of the collision.[14] As alleged in the complaints, which the Court accepts as true at this stage, CSX was responsible for the design, construction, and maintenance of the New London Crossing at the time of the collision.[15]

Mr. Fontana filed a complaint (the "First Filed Action") in Superior Court in April 2024. He named CSX Corporation, CSX Transportation, Inc., and Anita and Gabriel Oronzio, III, as personal representatives of The Estate of Luigi Oronzio as defendants.[16] Next, the Estate filed a separate complaint (the "Second Filed Action"). It named CSX Corporation and CSX Transportation, Inc. (together, the "CSX Defendants") as defendants.[17]

---

[8] *Id.* at ¶ 14.
[9] *Id.* at ¶ 15.
[10] *Id.* at ¶ 16.
[11] *Id.*
[12] *Id.*
[13] *Id.* at ¶ 17
[14] *Id.* at ¶ 18. The list of Mr. Fontana's alleged injuries included multiple arm fractures, a metacarpal deformity, an injured thigh muscle, permanent scarring, lumbar radiculopathy, back pain, headaches, post-traumatic stress disorder, depression, and anxiety disorder. *Id.*
[15] *Id.* at ¶¶ 20–21.
[16] Consolidation Order at 2 (D.I. 20).
[17] *Id.*

The CSX Defendants then removed the First Filed Action to the United States District Court for the District of Delaware.[18] Thereafter, the parties stipulated to remanding the matter to the Superior Court, which the District Court approved.[19]

As alleged in the complaints, and also accepted as true, CSX breached its common law duty to exercise reasonable care in multiple ways, including, *inter alia*, by failing to erect barriers to prevent errant vehicles from becoming stuck at New London Crossing. Plaintiffs further alleged that CSX recklessly disregarded the risks to motorists at the crossing. They contend that CSX's, and in part the Estate's, negligence and recklessness caused their injuries. They seek compensatory and punitive damages as a result.

Upon remand to the Superior Court, the parties to the First and Second Filed Actions stipulated to consolidation.[20] The CSX Defendants now move to dismiss the consolidated action, or alternatively, to strike certain allegations from the complaints.[21] The Court held oral argument on the motions on November 4, 2024.[22] It then dismissed CSX Corporation from the action for lack of personal jurisdiction without opposition by the Plaintiffs.[23] The Court's decisions regarding the remaining issues follow.

## II. THE PARTIES' CONTENTIONS

CSX moves to dismiss and strike certain allegations. It contends the following: (1) ICCTA preempts Plaintiffs' common law tort claims that relate to the

---

[18] *Id.*; *see also* Notice of Removal (D.I. 8). While in federal court, the CSX Defendants moved to dismiss the First Filed Action.

[19] D.I. 20, at 2; *see also* Stipulation and Order Granting Remand (D.I. 10).

[20] D.I. 20, at 3. Superior Court Civil Rule 42(a) provides that "[w]hen actions involving a common question of law or fact are pending before the Court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay."

[21] Mot. to Dismiss (D.I. 13).

[22] D.I. 29.

[23] D.I. 39.

6

design, construction, and maintenance of the New London Crossing; (2) Plaintiffs fail to state a claim that CSX negligently failed to erect a barrier at the New London Crossing because railroads have no duty to fence their lines; (3) Plaintiffs' allegations directed at CSX's state of mind do not support their punitive damage claims; (5) Plaintiffs' negligence *per se* claims based upon unidentified statutory and regulatory violations of state and federal law should be dismissed because they do not meet pleading requirements;[24] and (6) Plaintiffs' allegations concerning prior accidents at the New London Crossing and superfluous placeholder language in the complaint should be stricken.[25]

Plaintiffs, and the Estate, which also opposes CSX's motions in its capacity as a defendant in Mr. Fontana's complaint, counter as follows: (1) ICCTA does not expressly preempt Plaintiffs' common law tort claims; (2) Congress' enactment of the Federal Railroad Safety Act ("FRSA"),[26] which includes a savings provision for common law tort claims, demonstrates that ICCTA does not impliedly preempt their claims; (3) CSX's fencing argument is misplaced because that exception to a common law duty does not obviate CSX's duty to keep motorists safe at a designated public crossing; (4) the Plaintiffs properly pled their claims for punitive damages; (5) there is no basis to dismiss their negligence *per se* allegations because they should remain free to later specify the statutes and regulations they will rely upon; (6) the allegations concerning prior accidents are relevant to CSX's state of mind and should not be stricken; and (7) striking a reference in a complaint that merely recites the ability of the claimant to amend the complaint after discovery is inappropriate.

---

[24] CSX frames this portion of its motion as one to strike. The Court considers it to be more appropriately addressed as an aspect of CSX's motion to dismiss.
[25] *See generally* Opening Br. at 3–4 (D.I. 14).
[26] 49 U.S.C. §§ 20101–21311.

### III. STANDARDS

The complaint and any documents attached to it define the "universe of facts" the Court may consider when ruling on a Superior Court Civil Rule 12(b)(6) motion.[27] In Delaware, the standard to survive a motion to dismiss is reasonable conceivability.[28] To that end, the Court must not dismiss a claim unless the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof."[29] Under Rule 12(b)(6), the Court views the complaint in the light most favorable to the nonmoving party, accepts all allegations as true, and draws all reasonable inferences flowing from those allegations in favor of the nonmovant.[30] Even vague allegations in the complaint are sufficient if they give the opposing party notice of the claim.[31]

Separately, under Superior Court Civil Rule 12(f), "the Court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent or scandalous matter."[32] Here, the burden on the movant is a significant one. Namely, the movant must demonstrate "clearly and without doubt that the matter sought to be stricken has no bearing on the . . . litigation."[33] For that reason,

---

[27] *Lakeview Loan Servicing, LLC v. Green-Hall*, 2024 WL 4533514, at * 2 (Del. Super. Oct. 21, 2024).

[28] *In re Swervepay Acquisition, LLC*, 2022 WL 3701723, at * 6 (Del. Ch. Aug. 26, 2022) (quoting *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011)).

[29] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 897 (Del. 2002) (citing *Kofron v. Amoco Chems. Corp.,* 441 A.2d 226, 227 (Del. 1982)).

[30] *Deuley v. DynCorp Int'l, Inc.*, 8 A.3d 1156, 1160 (Del. 2010) (quoting *Clinton v. Enterprise Rent–A–Car Co.,* 977 A.2d 892, 895 (Del. 2009)).

[31] *Savor, Inc.*, 812 A.2d at 896–97.

[32] Super. Ct. Civ. R. 12(f) (providing in full that "[u]pon motion made by a party before responding to a pleading or, if no responsive pleading is permitted by these Rules, upon motion made by a party within 20 days after the service of the pleading upon the party or upon the Court's own initiative at any time, the Court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent or scandalous matter.").

[33] *Sun Life Assurance Co. of Canada v. Wilmington Tr., Nat'l Ass'n*, 2018 WL 3805740, at *1 (Del. Super. Aug. 9, 2018) (quoting *In re Estate of Cornelius*, 2002 WL 1732374, at *4 (Del. Ch. July 11, 2002)).

motions to strike are generally disfavored in Delaware and are infrequently granted.[34]

## IV.   ANALYSIS

The parties' principal dispute flows from a split of authority regarding whether ICCTA preempts state common law tort claims that relate to allegedly dangerous railroad crossings.[35]  Delaware courts have not addressed this issue.  As a result, the Court must independently examine the federal statutes and regulations involved and look to outside persuasive authority for guidance.[36]  As the Court will explain below, ICCTA does not (1) expressly, or (2) impliedly preempt such claims based upon ICCTA's alleged pervasiveness in federal statutory law.  Furthermore, (3) CSX fails

---

[34] *Belfint, Lyons & Shuman v. Potts Welding & Boiler Repair, Co.*, 2005 WL 2746332, at *2 (Del. Super. Aug. 26, 2005) (quoting *Pack & Process, Inc., v. Celotex Corp.,* 503 A.2d 646, 660 (Del. Super. 1985)).

[35] On one hand, courts of some jurisdictions have held that ICCTA does not preempt common law negligence claims.  *See e.g.*, *Horton v. Kansas City S. Ry. Co.*, 692 S.W.3d 112 (Tex. 2024) (holding that a plaintiff's claims that a railroad negligently maintained a rail crossing were not expressly or impliedly preempted by ICCTA); *Rushing v. Kansas City S. Ry. Co.*, 194 F. Supp. 2d 493 (S.D. Miss. 2001) (holding that a plaintiff's negligence claims related to a railroad's construction of an earthen berm were not preempted by ICCTA because they did not directly relate to the manner in which the railroad conducted its operations).  Courts of other jurisdictions have held the opposite— that ICCTA does preempt such claims.  *See e.g.*, *In re Katrina Canal Breaches Consol. Litig.*, 2009 WL 224072 (E.D. La. Jan. 26, 2009) (finding ICCTA preemption because "the application of state law negligence principles to assess and evaluate the suitability of the design and construction of a railroad crossing . . . qualifies as an attempt at state law 'regulation' in respect to rail transportation"); *Maynard v. CSX Transp., Inc.*, 360 F. Supp. 2d 836 (E.D. Ky. 2004) (holding that plaintiffs' common law negligence and nuisance claims relating to a railroad's construction and operation of side tracks were preempted under ICCTA because the plaintiffs' claims sought to "regulate the manner in which the defendant conduct[ed] operations at its switch yard").

[36] Congress' legislative power to preempt state law is derived from the Supremacy Clause of Article VI of the United States Constitution.  "Pre-emption occurs when Congress, in enacting a federal statute, expresses a clear intent to pre-empt state law, when there is outright or actual conflict between federal and state law, where compliance with both federal and state law is in effect physically impossible, where there is implicit in federal law a barrier to state regulation, where Congress has legislated comprehensively, thus occupying an entire field of regulation and leaving no room for the States to supplement federal law, or where the state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress." *Louisiana Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 368 (1986) (internal citations omitted).

9

to meet its burden at this stage of the proceedings by demonstrating that ICCTA impliedly preempts Plaintiffs' claims on an as-applied basis.

The Court will also resolve the duty portion of CSX's motion. There is a difference between requiring a railroad *to fence its rail lines* and imposing a duty upon a railroad to make its *railroad crossing reasonably safe*. Those two possible land possessor duties are not one and the same. There is no duty imposed on a railroad as to the former, but there remains a duty regarding the latter. The failure to erect a barrier at the New London Crossing may conceivably breach that duty because the Court must accept everything Plaintiffs allege as true. Finally, the Court will address CSX's remaining arguments in series after discussing the preemption and duty issues.

**A. ICCTA does not expressly or impliedly preempt Plaintiffs' common law tort claims because ICCTA's preemption provision does not mention tort claims and does not otherwise occupy the entire field relevant to railway regulation; in addition, CSX does not meet its burden at the motion to dismiss stage by demonstrating that ICCTA impliedly preempts Plaintiffs' claims on an as-applied basis.**

In 1995, Congress enacted ICCTA, which eliminated the Interstate Commerce Commission and replaced it with the Surface Transportation Board ("STB").[37] When doing so, Congress sought to provide a uniform federal scheme of regulation for railroad transportation in the United States.[38] Congress recognized when enacting ICCTA that forcing a patchwork of inconsistent state and local regulations would be burdensome on the railway industry.[39] To mitigate that burden, Congress vested the STB with broad regulatory power over "rail transportation and operations, including remedies related to railway transportation."[40]

---

[37] *Griffioen v. Cedar Rapids & Iowa City Ry. Co.*, 914 N.W.2d 273, 280 (Iowa 2018).
[38] *State v. BNSF Ry. Co.*, 432 P.3d 77, 82 (Kan. Ct. App. 2018).
[39] *Am. Rocky Mountaineer v. Grand Cnty., Utah*, 568 F. Supp. 3d 1231, 1237 (D. Utah 2021).
[40] *Griffioen*, 914 N.W.2d at 280.

ICCTA codifies the scope of the STB's regulatory authority under 49 U.S.C. § 10501(b). That provision, in turn, serves as ICCTA's preemption provision. There, ICCTA provides, in relevant part, that:

> [t]he jurisdiction of the [STB] over—
>
> (1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and
>
> (2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State,
>
> is exclusive. Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.[41]

ICCTA is not the only federal regulatory scheme that governs rail transportation, however. Namely, Congress had previously enacted the Federal Railroad Safety Act (again, "FRSA") in 1970 "to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents."[42] FRSA vests regulatory authority in the Secretary of Transportation to "prescribe regulations and issue orders for every area of railroad safety."[43] Like ICCTA, FRSA contains a preemption provision, found at 49 U.S.C. § 20106. It provides that "[l]aws, regulations, and orders related to railroad safety . . . shall be nationally uniform to the extent practicable."[44] Nevertheless, FRSA preserves the right for the states to "adopt or continue in force a law, regulation, or order related to railroad safety . . .

---

[41] 49 U.S.C. § 10501(b).

[42] 49 U.S.C. § 20101.

[43] 49 U.S.C. § 20103(a). FRSA also vests certain regulatory authority in the Secretary of Homeland Security with respect to railroad *security* matters.

[44] 49 U.S.C. § 20106(a)(1).

until the Secretary of Transportation (with respect to railroad safety matters) . . . prescribes a regulation or issues an order covering the subject matter of the State requirement."[45]

Some courts read FRSA's preemptive language expansively. As a result, Congress clarified the scope of FRSA's preemption in a 2007 amendment. That clarification (the "Savings Provision") provided:

> [n]othing in this section shall be construed to preempt an action under State law seeking damages for personal injury, death, or property damage alleging that a party–
>
> (A) has failed to comply with the Federal standard of care established by a regulation or order issued by the Secretary of Transportation (with respect to railroad safety matters), or the Secretary of Homeland Security (with respect to railroad security matters), covering the subject matter as provided in subsection (a) of this section;
>
> (B) has failed to comply with its own plan, rule, or standard that it created pursuant to a regulation or order issued by either of the Secretaries; or
>
> (C) has failed to comply with a State law, regulation, or order that is not incompatible with subsection (a)(2).[46]

At the outset, CSX focused only on ICCTA as the basis for preemption in its briefing. Plaintiffs correctly countered that FRSA must also be considered when examining federal statutory framework in the field. To that end, Congress' dual grant of regulatory authority to the STB *and* the Secretary of Transportation over aspects of the industry demonstrate Congressional intent that ICCTA not be considered in a vacuum. Rather, ICCTA's and FRSA's complementary authority, as federal courts have explained, "accurately reflects Congress' intent for ICCTA and FRSA to be

---

[45] *Id*. § 20106(a)(2).

[46] *Id*. § 20106(b)(1). The Savings Provision "app[lies] to all pending State law causes of action arising from events or activities occurring on or after January 18, 2002." *Id*. § 20106(b)(2).

construed *in pari materia*."[47]  As a result, the Court must consider both statutes during a portion of the analysis that follows.

At a bird's eye view, state common law claims for tort damages fall most directly within FRSA's purview—specifically, the third category of FRSA's Savings Provision.  There, the Savings Provision provides in relevant part that "[n]othing in this section shall be construed to preempt an action under State law seeking damages for personal injury, death, or property damage alleging that a party . . . has failed to comply with a State law . . . that is not incompatible with subsection (a)(2)."[48]

Plaintiffs correctly contend that CSX's alleged failure to meet state common law duties fall within the Savings Provision.  That is because state common law claims, as brought by Plaintiffs, constitute "state law."  Furthermore, Plaintiffs claims are not otherwise incompatible with paragraph (a)(2).  That paragraph merely permits states to adopt or continue laws related to railroad safety until the Secretary of Transportation prescribes otherwise.[49]  On that point, CSX identifies no regulation promulgated by the United States Department of Transportation that precludes Plaintiffs' state common law tort claims.  For these reasons, FRSA's Savings Provision preserves Plaintiffs' claims.[50]

---

[47] *Tyrrell v. Norfolk S. Ry. Co.*, 248 F.3d 517, 523 (6th Cir. 2001).

[48] 49 U.S.C. § 20106(b)(1)(C).

[49] The term "covering" as used in subsection (a)(2) "is a more restrictive term which indicates that pre-emption will lie *only* if the federal regulations substantially subsume the subject matter of the relevant state law."  *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993) (emphasis added). Thus, to prevail on a theory that common law tort claims are preempted, a party must establish that the federal regulatory authority acting under direction of the federal statute has promulgated regulations that substantially subsume that subject matter—i.e., no room exists for state regulation. *Id*.  As will be discussed below, the United States Supreme Court's holding in *Easterwood* addressed only FRSA.  Nevertheless, the Court's reasoning and analysis are equally applicable to general to questions of preemption, such as those raised in this case involving ICCTA.

[50] Conceivably, Plaintiffs' common law tort claims implicate railroad safety.  Namely, they allege that the New London Crossing was permitted to exist in an unsafe condition.  This provides an alternative basis for FRSA's applicability.

Turning next to ICCTA, and beginning with the issue of express preemption, the Court must first look to express congressional commands. ICCTA, through its plain language, grants exclusive jurisdiction to the STB to *regulate* rail carriers' "rates, classifications, rules . . ., practices, routes, services, and facilities" and the "construction, acquisition, operation, abandonment, or discontinuance of" tracks and facilities.[51] Nowhere in ICCTA does Congress mention state tort claims for damages. Rather, ICCTA explicitly preempts only those enumerated aspects of rail transportation, along with remedies "with respect to *regulation* of rail transportation."[52] Courts have nevertheless interpreted this phrase to include corresponding state and local efforts that have regulatory effect apart from actual regulations or ordinances.[53]

A state common law tort claim that seeks monetary damages, however, does not seek to regulate rail transportation. While the subject matter of state common law tort claims may relate to rail transportation, the aims and effects of such claims are not to regulate that industry.[54] Rather, such claims seek to provide compensation to an injured party for the tortious conduct of another.[55] For that reason, a common

---

[51] *Horton*, 692 S.W.3d at 129 (Tex. 2024) (quoting 49 U.S.C. § 10501(b)).

[52] 49 U.S.C. § 10501(b) (emphasis added).

[53] In *Franks Inv. Co., LLC v. Union Pacific R. Co.*, the United States Court of Appeals for the Fifth Circuit provided guidance on the phrase "with respect to regulation," found within 49 U.S.C. § 10501(b). 593 F.3d 404 (5th Cir. 2010). In parsing this phrase, the court, recognizing the holdings of other circuit courts, explained that "Congress narrowly tailored the ICCTA pre-emption provision to displace only 'regulation,' i.e., those state laws that may reasonably be said to have the effect of 'manag[ing]' or 'govern[ing]' rail transportation, . . . while permitting the continued application of laws having a more remote or incidental effect on rail transportation." *Id.* at 410 (quoting *Fla. E. Coast Ry. Co. v. City of W. Palm Beach,* 266 F.3d 1324, 1331 (11th Cir.2001)). Thus, only "[t]o the extent remedies are provided under laws *that have the effect of regulating rail transportation,* [are they] preempted." *Id.*

[54] *See Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 50 (1987) (explaining that under a common-sense view of the term "regulate," in order for a law to regulate, it must not just have an impact on a certain industry, but must be specifically directed toward that industry).

[55] *See Memphis Cmty. Sch. Dist. v. Stachura,* 477 U.S. 299, 306 (1986) (quoting F. Harper, F. James, & O. Gray, *Law of Torts* § 25.1, p. 490 (2d ed. 1986)) (emphasizing that damages in tort

14

law tort claim for damages will most often not equate to regulation of rail transportation.[56] Granted, ICCTA precludes many regulations adopted by local jurisdictions that seek to regulate railroads. Nevertheless, its lack of a reference to common law tort claims, and the lack of such a reference in regulations promulgated under ICTTA, means that there is no express preemption of such claims.

The United States Supreme Court explained why this is the case in *CSX Transportation*, *Inc. v. Easterwood*, albeit when examining FRSA rather than ICCTA.[57] There, the Court examined why FRSA, even pre-Savings Provision, did not expressly preempt common law tort claims. The Court began by recognizing that a court should apply the plain language of a preemption clause to determine Congress' preemptive intent.[58] The Court then explained that to prevail on a claim that state regulations are expressly preempted, the challenging party must demonstrate "more than that [such regulations] 'touch upon' or 'relate to' [the] subject matter" to be federally regulated.[59] The Court then followed with the recognition that neither FRSA nor regulations promulgated under FRSA directly mentioned common law negligence claims.[60] That meant FRSA, even before

---

actions are designed to provide compensation for the injury caused to a plaintiff resulting from the defendant's breach of duty).

[56] *See Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 261 (2013) (cautioning that federal law does not preempt state laws affecting a federally regulated field or industry "in only a tenuous, remote, or peripheral . . . manner" (citation omitted)); *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 519 (1992) (explaining that "the term 'regulation' most naturally refers to positive enactments by [regulatory] bodies, not to common-law damages actions"); *Horton*, 692 S.W.3d at 130 (explaining that "[r]ather than encompassing any law that might indirectly touch on the relevant subject matter, the phrase "with respect to" limits the [ICCTA's] preemptive effect so that it includes only those remedies that *directly* 'concern' or 'involve' the matter the clause describes") (emphasis added).

[57] 507 U.S. 658 (1993).

[58] *Id*. at 664.

[59] *Id*.

[60] *See id*. at 667–68.

Congress enacted its Savings Provision, did not *expressly* preempt negligence claims.

This reasoning, when applied to ICCTA, provides for the same result. Namely, ICCTA, like FRSA, does not mention state common law tort claims. Granted, ICCTA expressly preempts state and local *remedies* that affirmatively regulate rail transportation. That broadens the potential for preemption to matters beyond traditional regulations promulgated by state and local governments and their agencies. Namely, ICCTA may expressly preempt court claims that seek injunctive relief against a railroad, such as orders to effect improvements to or alteration of lines. While the Court recognizes that an award of damages under a common law tort claim may ultimately spur a railroad to alter its actions, operations, or procedures, such effect would be merely incidental to the original purpose of the claim. That would contrast with something akin to a mandatory injunction that *directs* a railroad to take corrective action. The former will generally not constitute regulation. The latter will more easily rise to such a level.

CSX relies significantly upon the federal district court decision in *Waneck v. CSX Corporation*[61] as representative of a line of pro-preemption holdings. At the outset, the *Waneck* suit's facts are relevant because that action arose out of a collision between a freight train and a charter bus that became stuck at a railroad crossing, as did Mr. Oronzio's vehicle.[62] The reasoning in the *Waneck* decision, however, is unpersuasive. In the Court's view, it and like federal and state decisions, misunderstand the Supreme Court's direction in *Easterwood*.

In *Waneck*, the plaintiffs sued the railroad in negligence for allegedly disregarding public safety at a crossing.[63] CSX contended there, as it does in this

---

[61] 2018 WL 1546373 (S.D. Miss. Mar. 29, 2018).
[62] *Waneck*, 2018 WL 1546373, at *1.
[63] *Id*.

case, that ICCTA preempted those claims because they related to the design, construction, and maintenance of its tracks.[64] At the outset, the court correctly recognized that "when a plaintiff's tort claim *directly attempts to manage or govern* a railroad's decisions in the economic realm, that claim 'is either wholly federal [under ICCTA] or nothing at all.'"[65] But, it incorrectly held that ICCTA preempted all tort claims as direct attempts to control railroad decisions regarding crossing design and construction.[66] The court reasoned, in conclusory fashion, that all state law damage claims constituted *direct attempts* to manage or govern a railroad's decisions in the economic realm regarding the construction, maintenance, and operation of tracks.[67]

The *Waneck* court did not consider or explain, however, how a plaintiff's claims for money compensation could rise to a level of *direct* interference with a railroad's decisions. In fact, *Easterwood* provides for the opposite. Namely, it held that negligence claims for damages, in the absence of on-point federal regulations, are not *direct* attempts to manage or govern a railroad's decisions in the context of FRSA. Likewise, neither ICCTA, nor regulations promulgated under ICCTA, expressly preempt such claims.

Express preemption is not the only means of federal preemption, however. The Court must also consider whether ICCTA impliedly preempts Plaintiffs' claims. In the absence of express preemption, the United States Supreme Court recognizes two circumstances where federal law impliedly preempts state laws and regulations: (1) where "the scope of a federal statute indicates that Congress intended federal law

---

[64] *Id*. at *2.
[65] *Id*. at *5 (quoting *Elam v. Kan. City S. Ry.*, 635 F.3d 796, 807 (5th Cir. 2011)) (emphasis added).
[66] *Id*.
[67] *Id*. (emphasis added).

to occupy a field exclusively," and (2) where a state law conflicts with or frustrates federal law.[68]

As to the former type of implied preemption—referred to as "field preemption"—the Court must determine whether Congress intended ICCTA to occupy the entire field of regulation.[69] If Congress had such intent, then a state regulation or claim is preempted. As to the latter type of implied preemption—referred to as "conflict preemption" or "as-applied preemption"—the Court must determine whether Plaintiffs' state common law tort claims frustrate ICCTA's purpose *under the circumstances of this case* because they contradict ICCTA or a federal regulation promulgated under the authority granted the STB under ICCTA.

Neither Plaintiffs nor CSX expended considerable effort on field preemption. That is most likely because ICCTA and FRSA coexist and together occupy the relevant field. In short, their coexistence means that neither one alone impliedly preempts the field. More specifically, when Congress enacted ICCTA but did not repeal FRSA, it clarified that intent. Moreover, as further evidence of Congressional intent, both ICCTA and FRSA separately authorize state regulations alongside their respective federal regulations.[70]

Tellingly, the STB itself, which has exclusive authority over enumerated aspects of rail transportation, agrees that Congress did not intend that ICCTA occupy the entire field.[71] Rather, the STB has provided guidance that ICCTA does not

---

[68] *Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 630 (2012).

[69] As previously noted, ICCTA and FRSA were intended by Congress to be read *in pari materia*.

[70] ICCTA "does not usurp the right of state and local entities to impose appropriate public health and safety regulation on interstate railroads." *King County,* 1996 WL 545598, at *3–4 (S.T.B.1996). Concomitantly, FRSA expressly permits state passage of laws, regulations, and orders related to railroad safety, provided that the Secretary of Transportation has not prescribed a regulation subsuming the entirety of the subject matter of the state requirement. 49 U.S.C. § 20106(a)(2).

[71] *See* 49 U.S.C. § 10501(b).

18

preempt "safety-related rail claims."[72]  When doing so, the STB reasoned that "the preemption of safety-related rail claims . . . should be governed by the provisions of the Federal Railroad Safety Act (FRSA) and not by 49 U.S.C. § 10501(b), as amended by the ICC Termination Act of 1995 (ICCTA)."[73]  FRSA, in turn, contains a Savings Provision, which expressly rescues safety-related state tort claims from preemption.  When the STB read ICCTA and FRSA *in pari materia*, it recognized there to be no field preemption.

The Court must also examine the second form of implied preemption—where state and federal law conflict to the extent that the state law frustrates the purpose of federal law as-applied.  Interestingly, both sides request the Court to resolve the issue as a matter of law in their favor.  They rely on persuasive authority to support their positions but do not focus on the stage of the litigation.  Namely, no final decision on as-applied preemption in this case can be made at the motion to dismiss stage.

As to the applicable standard, in *New York Susquehanna & Western Railway Corporation v. Jackson*,[74] the United States Court of Appeals for the Third Circuit articulated a two-part test for as-applied preemption.[75]  Notably, as in many cases, the *Jackson* court focused on *regulation* of railroads and crossing construction by municipal or state governmental entities—not tort claims.  In the regulatory context, the court explained that state *regulation* of railroad transportation is permissible and survives preemption if: (1) it is not unreasonably burdensome, and (2) if it does not

---

[72] *Jimmy Lee Waneck & Starr Swearingen Waneck, et al-Petition for Declaratory Ord.*, No. FD 36167, 2018 WL 5723286, at *1 (S.T.B., Oct. 31, 2018).
[73] *Id.*
[74] 500 F.3d 238 (3d Cir. 2007).
[75] The touchstone of this analysis is "whether the state regulation imposes an unreasonable burden on railroading." *Id.* at 253 (citing *Cities of Auburn & Kent*, 1997 WL 362017, at *6 (S.T.B. 1997)).

discriminate against railroads.[76]  As such, the inquiry for as-applied preemption is a fact-intensive one.[77]

Under the first requirement—the "unreasonably burdensome" requirement— a state regulation's impact "must not be so draconian that it prevents the railroad from carrying out its business in a sensible fashion."[78]  While a state may promulgate regulatory ground rules, "those rules must be clear enough that [a] rail carrier can follow them and that the state cannot easily use them as a pretext for interfering with or curtailing rail service."[79]   Under the second requirement—the "non-discriminatory" requirement—"for a state regulation to pass muster, it must address state concerns generally, without targeting the railroad industry."[80]  To that end, "even a regulation that is definite on its face may be challenged as-applied if unreasonably enforced or used as a pretext to carry out a policy of delay or interference."[81]

Common law tort claims, standing alone, are not "regulations."  The entire premise in considering whether they are preempted, however, assumes that in some circumstances they may seek a remedy that rises to the level of regulating, i.e., through something akin to a mandatory injunction or by rising to the level of direct interference.  Because such claims could conceivably contradict federal law on an

---

[76] *Id.*  The United States Court of Appeals for the Sixth Circuit has also recognized the as-applied preemption test set forth by the Third Circuit in *Jackson.  See generally Adrian & Blissfield R. Co. v. Vill. of Blissfield,* 550 F.3d 533, 541 (6th Cir. 2008).  The animating idea behind this test is that "while state and local government entities . . . retain certain police powers and may apply non-discriminatory regulation to protect public health and safety, their actions must not have the effect of foreclosing or restricting the railroad's ability to conduct its operations or otherwise unreasonably burden interstate commerce."  *Borough of Riverdale,* 1999 WL 715272, at *6 (S.T.B. 1999).

[77] *Jackson,* 500 F.3d at 253

[78] *Id.* at 254.

[79] *Id.*

[80] *Id.*

[81] *Id.* at 255.

as-applied basis, they rightfully fall under the analysis explained in *Jackson*. As such, there may be instances when a common law tort claim rises to the level of being both unreasonably burdensome and discriminatorily targeted at only railroads. Nevertheless, it is difficult to imagine a situation where a question regarding as-applied preemption could be resolved at the Rule 12(b)(6) stage.

As the Texas Supreme Court recently recognized in *Horton v. Kansas City Southern Railway*,[82] the "conflict" prong of implied preemption "may impliedly preempt a generally applicable state-law remedy if, *as applied* to a particular case, that remedy has the effect of 'unreasonably burdening or interfering with rail transportation.'"[83] At the outset, the party advocating preemption carries the burden on that issue.[84] In the context of ICCTA and a claim involving railroad crossings, the party advocating preemption "must provide specific evidence regarding the crossing at issue" rather than relying on assertions about general effects on rail transportation.[85]

The Texas Supreme Court's decision in *Horton* is helpful because of both its thoughtful analysis and the case's procedural posture. Namely, in an appeal of a *post-trial decision,* the Texas high court examined a railroad defendant's evidentiary shortfall in demonstrating as-applied preemption on a full trial record. There, the railroad defendant provided no case-specific evidence at trial to support as-applied

---

[82] 692 S.W.3d 112 (Tex. 2024). In *Horton*, a train operated by the rail defendant collided with a pickup truck as it drove across railroad tracks, killing the driver. *Id*. at 119. The tracks were maintained by the rail defendant, and over time had formed what is referred to as a "humped crossing"–a condition created "by lifting and adding materials under the rails and ties, incrementally raising the track over the course of many years." *Id*. Thereafter, the pickup truck driver's children brought an action in negligence against the rail defendant regarding the humped crossing. *Id*. The rail defendant sought summary judgment, asserting *inter alia*, that federal law preempted the plaintiff's claims. *Id*.
[83] *Id*. at 132 (quoting *Elam v. Kan. City S. Ry.*, 635 F.3d 796, 805 (5th Cir. 2011)) (emphasis added).
[84] *Id*. (citing *Mo. Pac. R.R. v. Limmer*, 299 S.W.3d 78, 84 (Tex. 2009)).
[85] *Id*. at 133 (citations omitted).

preemption.[86]  In that way, the rail carrier did not meet its burden of affirmatively showing that the plaintiff's negligence claims "would pose the unreasonable burden or interference with rail transportation required to trigger implied preemption under [ICCTA]."[87]  It is difficult to conceive how CSX could meet its burden of demonstrating this type of preemption at the motion to dismiss stage.  Rather, a fully developed evidentiary record either at the summary judgment stage, or at trial as in *Horton*, will be necessary to determine whether ICCTA preempts Plaintiffs' claims on an as-applied basis.

The second requirement for as-applied preemption in the tort claims context is no less of a lift at the motion to dismiss stage—in fact, it is a greater one.  That requirement establishes a high hurdle for a railroad to overcome when advocating as-applied preemption of a common law tort claim.  Namely, state common law duties that form the basis for tort claims often apply to all like-situated parties—in this case *land possessors or owners*.  In Delaware, which is not unique in terms of negligence law, it is difficult to conceive how a duty imposed upon all landowners could discriminate against one subclasses of landowners such as railroads.  Regardless of whether CSX may later meet its burden on this issue, CSX seeks to prematurely prevail on a fact-intensive matter in the absence of facts of record.

On balance, CSX does not meet its burden of demonstrating that Plaintiffs' claims are unreasonably burdensome, that they discriminate against railroads, or that they otherwise conflict with or frustrate ICCTA's purpose.  CSX did not provide any evidence, nor would it be able to at this stage of the suit, to meet its burden of

---

[86] *Id*. at 134.  During the underlying trial in *Horton*, the plaintiff offered a railroad-maintenance expert who testified without opposition from the rail carrier about potential options to fix the relevant crossing, along with the associated costs.  *Id*.  The rail carrier, however, did not present its own expert or offer specific evidence to rebut the likely costs and burdens of the potential fixes. *Id*.  Instead, the rail carrier relied on the plaintiff's expert's deposition testimony, which the expert later testified was an inaccurate interpretation.  *Id*.

[87] *Id*. at 135.

demonstrating that Plaintiffs' state common law tort claims would unreasonably burden rail transportation or discriminate against it.

### B. CSX owed a duty of reasonable care to protect the traveling public at a railroad crossing.

Plaintiffs claim that CSX breached its common law duty by failing to erect a barrier at the New London Crossing to protect members of the traveling public from foreseeable harm at the crossing. CSX moves to dismiss the claim. When doing so, it relies on the well-recognized absence of a duty for railroads to fence their lines.

At the outset, CSX correctly recognizes that there is no common law duty that requires landowners to enclose their property with fencing.[88] The absence of that duty extends in turn to railroads, who have no duty to fence their tracks—primarily because requiring fencing for innumerable miles of track would impose an unreasonable burden.[89] The absence of a duty to fence tracks, however, is different from a duty to take reasonable care to protect those who could foreseeably be harmed at an unsafe crossing.

The Delaware Supreme Court's decision in *Malin v. Consolidated Rail Corporation*[90] singularly resolves this disagreement. There, the Delaware Supreme Court defined the duty a railroad owes motorists who traverse a crossing under the railroad's control.[91] The Court began its analysis by clarifying that a motorist who

---

[88] *See generally*, *Villani v. Wilmington Hous. Auth.*, 106 A.2d 211, 213 (Del. Super. 1954).

[89] *See Laurie v. Nat'l Passenger R.R. Corp.*, 105 Fed. Appx. 387, 391 (3d Cir. 2004) (holding that a railroad had no duty to erect or maintain fences on its right-of-way); *Dugan v. Pennsylvania R. Co.*, 127 A.2d 343, 348 (Pa. 1956) (explaining that it would be "hopelessly impracticable" to impose on a railroad the "duty of fencing the innumerable places along its many miles of tracks"); *Barnes v. Pleasanton*, 73 A.2d 787, 790 (Del. Super. 1950) (recognizing that there was no statutory provision in Delaware requiring railroad companies to fence their property and that general fencing law as it then existed did not apply to railroads).

[90] 438 A.2d 1221 (Del. 1981).

[91] In *Malin*, the plaintiff, a City of Wilmington sanitation worker, was injured when a train owned by the defendant, Consolidated Rail Corporation, struck a city garbage truck as it was traversing a crossing. *Id*. at 1221. The plaintiff then pursued an action in negligence against the rail defendant. *Id*.

traverses a public railroad crossing is a "public invitee."[92]  Given that status, the Court held that members of the public traveling on a public road that crosses train tracks via a public crossing are owed a duty of reasonable care by the railroad who controls that crossing.[93]  More specifically, the railroad who is the possessor of the crossing has  "[t]he duty to use reasonable care to keep such land in proper and safe condition."[94]

Here, Plaintiffs contend that CSX did not exercise reasonable care to make the New London Crossing safe for motorists who cross it—*inter alia*, by failing to place a barrier at the crossing.  When accepting the Plaintiffs' allegations as true, the failure to erect a barrier at the New London Crossing would breach CSX's duty of care.  The absence of a duty to fence along the entirety of a rail line does not insulate a railroad from its duty as a landowner to exercise reasonable care to protect members of the public who traverse a railroad crossing that it controls.  Fencing, which is the cordoning off of an entire structure or area in its entirety, does not equate to erecting a barrier at the point where a railroad intersects with a public roadway.

---

[92] *Id*. at 1224.  In classifying such persons as "public invitees" the court relied upon Restatement (Second) of Torts section 332, comment (d), providing that "[w]here land is held open to the public, there is an invitation to the public to enter for the purpose for which it is held open, any member of the public who enters for that purpose is an invitee."

[93] *Id*. at 1226; *cf. Niblett v. Pennsylvania R. Co.*, 158 A.2d 580, 582 (Del. Super. Ct. 1960) (explaining that "[t]he general rule is well established that the owner of land who invites a person to go upon his premises owes to such person a duty to exercise care, and to have his premises in a reasonably safe condition").

[94] *Id*.  Although not relied upon in *Malin*, the Court notes that Delaware has expressly adopted Restatement (Second) of Torts §343, which sets forth the elements necessary to establish liability for dangerous conditions on land known to or discoverable by the possessor.  *See generally DiOssi v. Maroney*, 548 A.2d 1361, 1366 (Del. 1988).  Section 343 provides that "[a] possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he . . . knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and . . . should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and . . . fails to exercise reasonable care to protect them against the danger."  Restatement (Second) of Torts § 343 (1965).  This defines the duty applicable to CSX in this case provided that CSX designed, constructed, and maintained the New London Crossing as the Plaintiffs allege.

CSX's motion to dismiss based upon the contention that it owed Plaintiffs no duty to place a barrier at the New London Crossing must be denied.

## C. Plaintiffs permissibly plead CSX's state of mind generally when claiming punitive damages.

CSX also seeks dismissal of Plaintiffs' punitive damage claims because the complaint does not allege specific facts to support their allegations regarding CSX's state of mind. Delaware is a notice pleading jurisdiction. Under that standard, a plaintiff must merely allege conduct sufficient to provide notice of the basis for the plaintiff's claim.[95] Here, Superior Court Civil Rule 9(b) singularly controls the Court's review. Rule 9(b) provides that averments involving malice, knowledge, and other conditions of mind may be averred generally.[96] Only allegations of fraud, negligence, or mistake must be stated with particularity.[97]

Accordingly, Plaintiffs' averments as to CSX's state of mind need not have been pled with particularity.[98] The Plaintiffs sufficiently contend that CSX possessed the state of mind necessary to recover punitive damages. Thus, CSX's motion to dismiss Plaintiffs' punitive damage claims on that ground must be denied.

## D. Plaintiffs' references in the complaint to unspecified statutory and regulatory violations of state and federal law are not sufficient to state negligence *per se* claims.

Again, Delaware is a notice pleading jurisdiction which means that a plaintiff must provide sufficient notice of the basis of their claims. In fact, in the context of negligence, they must do so with particularity.[99] CSX emphasizes that Plaintiffs' complaint fails to identify a specific state or federal law or even a broad statutory

---

[95] *O'Reilly v. Transworld Healthcare, Inc.*, 745 A.2d 902, 912–13 (Del. Ch. 1999).
[96] Super. Ct. Civ. R. 9(b).
[97] *Id.*
[98] Plaintiffs' averments as to CSX's state of mind included the following mental states: knowingly, consciously, wantonly, willfully, and recklessly. D.I. 1.
[99] Super. Ct. Civ. R. 9(b).

framework that CSX is alleged to have violated. CSX styles its motion as one to strike Plaintiffs' references to negligence *per se* liability. The Court elects to address this aspect of CSX's motion as one to *dismiss* Plaintiffs' negligence *per se* claims, however, because a motion to strike under Rule 12(f) is not the equivalent of a partial motion to dismiss under Rule 12(b)(6).

Here, while "[e]ven vague allegations are considered well pled if they give the opposing party notice of a claim," on their face, Plaintiffs' allegations are insufficient to sustain a claim because they identify no specific statute or regulation.[100] The untethered negligence *per se* claims give CSX no notice of where to begin evaluating them given the number of potentially applicable laws.[101] Although Plaintiffs will remain free to seek to amend their complaint to add such specific claims if they later become apparent, they fail to meet notice pleading standards at this point, much less the specificity required by Rule 9(b). As a result, their complaints fail to state a claim upon which relief may be granted in negligence *per se*. Those claims are appropriately dismissed.

### E. Plaintiffs' references to prior accidents at the New London Crossing and superfluous placeholder language are not stricken.

CSX next seeks to strike Plaintiffs' references to past accidents at the New London Crossing because they are unrelated to the accident at issue.[102] Plaintiffs counter that evidence of CSX's prior acts will be admissible on the issue of punitive damages. They assert that in the absence of actual ill will, punitive damages may be proven through showing CSX's state of mind—i.e., willful or wanton conduct or reckless indifference to the rights of others. To that end, they posit that the prior

---

[100] *Scarangello v. Culley*, 2024 WL 2352524, at *3 (Del. Super. May 22, 2024).
[101] *J.K. ex rel. Kpakah v. CSX Transp.*, 2014 WL 4632356, at *4 (E.D. Pa. Sept. 16, 2014).
[102] Again, pursuant to Superior Court Civil Rule 12(f), "the Court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent or scandalous matter."

accidents at the New London Crossing will help to demonstrate a state of mind required to support punitive damages.

Punitive damages are "awarded against a person to punish [that person] for his [or her] outrageous conduct and to deter [that person] and others like him [or her] from similar conduct in the future."[103] Conduct may be deemed outrageous either because of an express evil motive or a reckless indifference to the rights of others.[104] To demonstrate reckless indifference to the rights of others it "is not enough that a decision be wrong. It must result from a conscious indifference to the decision's foreseeable effect."[105] Thus, to justify the imposition of punitive damages, it is necessary to demonstrate "a distinct state of mind."[106]

Character evidence is inadmissible in civil proceedings. Nevertheless, Delaware Rule of Evidence 404(b) permits evidence of a crime, wrong, or other act for purposes other than to prove a person's character or predisposition to act in a similar manner.[107] A non-exhaustive list of the other purposes for which such evidence may be offered includes "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."[108] Proving prior bad acts for the purpose of proving a state of mind necessary to impose punitive damages falls within what could be admissible evidence under D.R.E. 404(b).[109]

In *Getz v. State*,[110] the Delaware Supreme Court provided the analytical framework for questions arising under D.R.E. 404(b). Although it did so in the

---

[103] *Strauss v. Biggs*, 525 A.2d 992, 999 (Del. 1987) (quoting *Jardel Co. v. Hughes*, 523 A.2d 518, 529 (Del. 1987)).
[104] *Jardel Co. v. Hughes*, 523 A.2d 518, 529 (Del. 1987) (quoting Restatement (Second) of Torts § 908, cmt. b (1979)).
[105] *Id*.
[106] *Id*.
[107] Del. R. Evid. 404(b)(1).
[108] Del. R. Evid. 404(b)(2).
[109] *Moyer v. Am. Zurich Ins. Co.*, 2021 WL 1830366, at *4 (Del. Super. May 7, 2021).
[110] 538 A.2d 726, 734 (Del. 1988).

criminal-case context, the *Getz* criteria apply fully in the civil-case context as well.[111] In civil cases, these criteria include:

(1) [t]he evidence of other [bad conduct] must be material to an issue of ultimate fact in dispute in the case. If the [proponent] elects to present such evidence in its case-in-chief it must demonstrate the existence, or reasonable anticipation, of such a material issue[;]

(2) [t]he evidence of other [bad conduct] must be introduced for a purpose sanctioned by Rule 404(b) or any other purpose not inconsistent with the basic prohibition against evidence of bad character or criminal disposition[;]

(3) [t]he other [conduct] must be proved by evidence which is plain, clear and conclusive[;]

(4) [t]he other [conduct] must not be too remote in time from the charged offense[;]

(5) [t]he Court must balance the probative value of such evidence against its unfairly prejudicial effect, as required by D.R.E. 403[; and,]

(6) [b]ecause such evidence is admitted for a limited purpose, the jury should be instructed concerning the purpose for its admission as required by D.R.E. 105.[112]

Application of these criteria is a highly factual undertaking. Typically, the Court conducts a "*Getz* hearing" *in limine* to resolve these matters if the decision is not first resolved within a motion for summary judgment.

Plaintiffs allege that the prior accidents at the New London Crossing are necessary to demonstrate CSX's state of mind when seeking punitive damages. While the Plaintiffs will ultimately bear the burden on this issue, it is inappropriate to decide the matter adversely to them at the motion to dismiss stage. A complete *Getz* analysis would be required on a full evidentiary record before the Court could determine if evidence of prior accidents will be admissible at trial for such a purpose.

---

[111] *Moyer*, 2021 WL 1830366, at *4–5 (citing *Mercedes-Benz of N. Am., Inc., v. Norman Gershman's Things to Wear, Inc.,* 596 A.2d 1358, 1365 (Del. 1991)).

[112] *Getz*, 538 A.2d at 734.

Accordingly, it is inappropriate to strike such references from the complaint. They may, or may not, ultimately be admissible to prove something other than CSX's character or predisposition to negligence. Here, under a Rule 12(b)(6) review, they will conceivably be relevant to support a permissible purpose.

Finally, it is inappropriate to apply Rule 12(f) to strike what is simply superfluous language in the complaint—a place holder provision that preserves the right for future motions to amend. To this end, Delaware courts liberally grant motions to amend.[113] Correspondingly, they sparingly grant motions to strike.[114] There is no dispute that Plaintiffs will retain the right to seek an amendment to their complaints based upon newly discovered evidence. Rule 12(f)'s mechanism is an inappropriate means to strike what is merely a truism.

## V. CONCLUSION

For the aforementioned reasons, ICCTA does not expressly preempt Plaintiffs' common law tort claims. It also does not impliedly preempt them on the basis of field preemption. On the basis of as-applied preemption, CSX's motion must likewise be denied. Evidentiary context will be necessary to resolve that question.

Furthermore, the absence of CSX's duty to fence the entirety of its tracks does not obviate its duty to take reasonable measures to keep New London Crossing reasonably safe for the public. Plaintiffs contend, in part, that the failure to erect a barrier at the New London Crossing breaches that duty. The Court must accept that allegation as true at this stage of the proceedings.

Finally, Plaintiffs' general averments regarding CSX's state of mind and references to prior accidents at the New London Crossing meet Delaware pleading requirements. Plaintiffs' allegations of unspecified regulatory and statutory

---

[113] *CNH Indus. Am. LLC v. Am. Cas. Co. of Reading*, 149 A.3d 242, 246 (Del. Super. 2016).
[114] *DDS Striker Holdings, LLC v. Verisk Analytics, Inc.*, 2024 WL 3983973, at *3 (Del. Super. Aug. 29, 2024).

violations, however, do not, and are appropriately dismissed without prejudice. Finally, the Court declines to strike superfluous language from the complaint that states something that is unnecessary but true.